(274 P.3d 30)
No. 104,469

STATE OF KANSAS, *Appellant*, v. TREVER RHODES WENDLER, *Appellee*.

[redacted] Opinion filed March 23, 2012. [redacted]

*Darren E. Root*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Steve Six*, attorney general, for appellant.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellee.

Before BUSER, P.J., ARNOLD-BURGER, J., and BUKATY, S.J.

BUSER, J.: The State of Kansas appeals the district court's order suppressing a large quantity of marijuana seized by law enforcement officers after a traffic stop of a recreational vehicle (RV) driven by Trever Rhodes Wendler.

We conclude that under the totality of the circumstances, the duration of the traffic stop was measurably extended after the purpose of the traffic stop—to investigate Wendler's commission of a traffic violation—was concluded. Moreover, during the investigation into the traffic violation, the officer did not gain reasonable suspicion of illegal drug activity necessary to lawfully extend the scope and duration of the detention. Finally, we conclude the unlawful detention of Wendler infected or tainted his consent to answer questions and to search the RV. Accordingly, we affirm the ruling of the district court suppressing the marijuana seized from the RV and the dismissal of charges against Wendler.

## FACTUAL AND PROCEDURAL BACKGROUND

As a result of the traffic stop, on November 10, 2009, the State charged Wendler with possession of marijuana with intent to sell (K.S.A. 2009 Supp. 21-36a05[a][4]) and failure to affix a drug tax stamp (K.S.A. 79-5201). Prior to trial, Wendler filed a motion to suppress the marijuana found hidden in the RV. During hearings on the motion, the State presented testimony from the arresting officer, Robert Youse of the Topeka Police Department, and a DVD of the vehicle stop taken from a camera mounted on Officer Youse's patrol vehicle. At the conclusion of the hearings, the district court made numerous and detailed findings of fact and conclusions of law.

The district court found Officer Youse stopped the RV for following another vehicle too closely on Interstate 70, in violation of K.S.A. 8-1523. Wendler was the driver, and the passengers were his girlfriend/fiancée and their infant son. During the stop, the officer noticed a "strong odor of air freshener" coming from the interior of the RV.

The district court found that Officer Youse asked Wendler "some general investigatory questions regarding his travel mode plans, and asked for license and registration." Wendler told the officer "he was driving a rented [RV], [and he] displayed a driver's license that had been issued from the State of Florida." Wendler said he was driving from San Diego, California, to Florida. The district court surmised that "the minute [Officer Youse] heard rental, California, [and] Florida, . . . he was going to . . . keep [the RV] as long as he possibly could."

Officer Youse took Wendler's license and registration to his police vehicle "to run it." According to the district court, the officer sat "there for a good three, three and-a-half minutes not doing anything." He then called "the information into dispatch." The DVD shows this occurred about 6 minutes after the stop began.

According to the district court, the dispatcher took "three minutes to come back negative," so 9 minutes had elapsed since the vehicle stop. Officer Youse then "just [sat] there and [did] nothing with the information, but wait[ed] another five minutes" before returning to the RV. From these facts, the district court inferred the officer was "stretching the stop out as long as he possibly [could]," even though the information was "all negative."

Upon approaching Wendler again, Officer Youse "initiate[d] another conversation . . . asking now about the rental papers" and about Wendler's employment. Wendler told Youse that he worked on boats. The district court concluded that Officer Youse "was obviously just trying to get additional information, which he got, but which . . . nonetheless . . . didn't relate back to the reason for the initial stop [and] didn't really elicit any more information to support his reasonable suspicion."

The rental papers "were all in order," with Wendler listed as "an authorized operator," although "somebody else" had rented the

RV for Wendler. When Officer Youse returned to his patrol vehicle, he learned from dispatch that Wendler "did have criminal convictions—or criminal activity of some sort in Florida and Colorado." The DVD shows Officer Youse discussed Wendler's criminal history with the dispatcher about 18 minutes after the stop. The district court found that Officer Youse then waited for another officer, who arrived in about "four to five minutes."

While waiting, Officer Youse "was not pursuing any information. He was not actually working on trying to verify anything or clear up anything." The district court opined, "There was nothing inconsistent with [Wendler's] information, . . . it's all believable," and it "may be true." Even after the other officer arrived, he and Officer Youse were not "engaged in any activities that were designed to dispel or confirm any sort of information relating to the traffic stop." The total length of the stop at this point was "at least 25 minutes."

The district court made no findings regarding Officer Youse's next actions, but the DVD shows the officer approached the driver's door of the RV while the assisting officer approached the passenger's side. The officers were both in uniform and armed. The emergency lights on Officer Youse's patrol vehicle were illuminated.

Officer Youse asked Wendler to leave the vehicle. The officer then accompanied Wendler to the back of the RV, where the assisting officer joined them.

The district court found that Officer Youse made "the very standard attempt to effectuate a release from custody." The officer advised Wendler that he was giving him a warning. Officer Youse then said, "[T]hat's all, or something to that effect," and Wendler turned towards the front of the RV to walk away. Then, according to the district court, "because . . . it's a highway and all that, Officer Youse has to call out pretty loudly, hey, Trev[e]r, would you come—and Mr. Wendler turns around, and he has to come back to Officer Youse to talk to him." This exchange is audible on the DVD.

The district court found that Officer Youse started "into the typical . . . questions. Do you have anything else, do you—you

know, what's up, all that." The district judge characterized these as a "shotgun of questions, . . . you don't have this, you don't have that, you don't have this, you don't have that, well, can I search your [RV]?" Answering "hesitantly and reluctantly," Wendler said, "[S]ure, but will this take very long?" Officer Youse said, "[N]o, just a few minutes."

The district court found that Officer Youse "direct[ed] Mr. Wendler back" to the patrol vehicle and "directed the removal of Mr. Wendler's girlfriend and baby from the RV." The three were then "secured" in the patrol vehicle. The district court found the search "did not take just a few minutes" and that Officer Youse was inside the RV "for more than 15 minutes," yet "couldn't find anything."

Wendler approached the RV while Officer Youse was searching it. The conversation between the two men is audible on the DVD. Wendler first asked to retrieve a jacket. Officer Youse agreed to the request and then asked Wendler about his criminal history. Based on the DVD, this was the first time Officer Youse made such an inquiry—about 39 minutes into the stop. Wendler admitted to drug-related convictions in New Orleans, Colorado, and Florida. After about 4 minutes of questioning about his criminal history and the circumstances surrounding the rental, Wendler returned to the patrol vehicle.

Next, Officer Youse used an electric screwdriver to remove some panels from the inside of the RV. The district court made no findings on the actual discovery of the marijuana, but Officer Youse testified, "I took my screwdriver and took off the frame around the microwave and pulled the microwave out so you could see behind it." He found 20 bundles of marijuana packed around the microwave. The DVD shows this discovery occurred about 46 minutes after the stop, and Wendler was arrested shortly thereafter.

Based on these factual findings, the district court made several legal conclusions. First, the district court determined that Officer Youse had probable cause to stop the RV for violation of K.S.A. 8-1523, following another vehicle too closely. This holding is not contested on appeal. Second, the district court found Officer Youse's initial questioning of Wendler, the request for his driver's

license and registration, and the check for "wants and warrants" were lawful. This ruling is also not an issue on appeal.

The district court rejected the State's argument that Wendler's travel route to Florida by way of Kansas was suspicious. "I do not find it is that odd to drive a northerly route," the district judge stated, adding, "[T]his case does not exhibit nearly the deviance in travel plans that other cases have upheld." The district court reached a similar conclusion with respect to the rental status of the RV and the strong odor of air freshener inside the vehicle. According to the district court, these three circumstances, even in combination, did not "rise to the level that objectively would support reasonable suspicion, and [the district court was] quite cognizant that reasonable suspicion does not have to be much."

The district court also held that Wendler remained in custody after Officer Youse returned his driver's license and documents along with a warning citation. It held at that time no "person . . . similarly situated objectively would have felt free to go, or was free to go." The district court held that Wendler remained in custody, along with his girlfriend and son, while Officer Youse was searching the RV. "They are not free to go. They—it is obvious from their conversations with the officers then that they do not feel, nor do they have the ability to leave. They have been removed from the [RV and], secured in the [patrol vehicle]."

Finally, the district court held Officer Youse's search "exceeded the scope of the consent." Pertinent to this finding, the district court focused on the length of time required to conduct the search and stated, "Wendler did say . . . well, will this take very long, I'm kind of in a hurry, and [Officer] Youse clearly says, no, it will just take a few minutes."

The district judge then summarized her ruling:

"So I find that the length of the time that Mr. Wendler was detained was longer than was necessary to . . . effectuate the purpose of the stop; that [Officer Youse] did not have reasonable suspicion to continue the detention for as long as he did after the rental papers had been presented showing that he was clearly an authorized person to possess and operate the [RV]; and last, that the search exceeded the scope of the consent—or that there was not a valid consent to the search."

The district court suppressed the marijuana and dismissed the case. The State filed a timely appeal.

## Was the Length and Scope of the Detention Reasonably Related to the Investigation of a Violation of K.S.A. 8-1523?

On appeal, the State contends the district court erred in concluding that Officer Youse measurably extended the duration of the traffic stop beyond what was necessary to investigate the violation of K.S.A. 8-1523, following another vehicle too closely. In particular, the State asserts "the record does not contain substantial evidence to support a conclusion that [Officer] Youse measurably extended the stop."

Wendler counters: "The district court properly found that Officer Youse's detention of [Wendler] for over 26 minutes, nearly 17 of which occurred after Officer Youse knew that [Wendler] had no 'wants or warrants,' exceeded the reasonable scope of a traffic stop . . . , thus violating his rights under the Fourth Amendment and § 15 of the Bill of Rights to the Kansas Constitution."

Our standard of review provides: "When reviewing a motion to suppress evidence, an appellate court reviews the factual underpinnings of a district court's decision for substantial competent evidence and the ultimate legal conclusion drawn from those facts de novo. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review. The State bears the burden to demonstrate that a challenged search or seizure is lawful." *State v. Morlock*, 289 Kan. 980, Syl. ¶ 1, 218 P.3d 801 (2009).

"A traffic stop may not exceed the scope or duration necessary to carry out the purpose of the stop. When conducting a routine traffic stop, a law enforcement officer may request a driver's license and vehicle registration, conduct a computer check, and issue a citation." *State v. Thompson*, 284 Kan. 763, Syl. ¶ 7, 166 P.3d 1015 (2007). Our Supreme Court clarified in *Morlock* that " '[a]n officer's inquiries into matters unrelated to the justification for the stop do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not *measurably extend* the duration of the stop.' " (Emphasis added.) 289 Kan. at 987 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 [2009]).

However,

"[i]f no information raising a reasonable and articulable suspicion of illegal activity is found during the time period necessary to perform the computer check and other tasks incident to a traffic stop, the motorist must be allowed to leave without further delay or questioning unless (1) the encounter between a law enforcement officer and the driver ceases to be a detention, it becomes consensual, and the driver voluntarily consents to additional questioning or (2) during the traffic stop the officer gains a reasonable and articulable suspicion that the driver is engaged in illegal activity." *Thompson*, 284 Kan. 763, Syl. ¶ 8.

The State and Wendler agree that about 26 minutes elapsed from the beginning of the traffic stop until Officer Youse returned Wendler's driver's license and documents, gave him a warning citation, and shook his hand—presumably ending Wendler's detention for the traffic violation.

In reviewing this traffic stop we first consider whether Officer Youse " 'diligently pursued' " his investigation and the tasks associated with the traffic stop. See *State v. Smith*, 286 Kan. 402, 410, 184 P.3d 890, *cert. denied* 555 U.S. 1062 (2008). In this regard, "courts examine 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.' " 286 Kan. at 410 (quoting *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 [1985]). Whether a law enforcement officer was "deliberately stalling" is "a quintessential question of fact." *State v. Ofori*, 170 Md. App. 211, 243, 906 A.2d 1089 (2006).

The district court unquestionably found that Officer Youse was stalling from the very outset of the traffic stop. While different conclusions could be drawn, the district court's factual finding is supported by the evidence. The DVD shows about 3 minutes elapsed after Officer Youse's initial return to his patrol vehicle with Wendler's driver's license and registration papers until he contacted the dispatcher. During that time, the district court observed the officer sat in his patrol vehicle "not doing anything." Three minutes later, the dispatcher returned with a "negative" report on Officer Youse's request for any outstanding warrants or wants on Wendler. As the district court observed, once again, Officer Youse

"just [sat] there and [did] nothing with the information, but wait[ed] another five minutes" before returning to the RV to ask Wendler for the vehicle's rental papers. At this point, the traffic stop had lasted about 15 minutes, and the district court concluded Officer Youse was "stretching the stop out as long as he possibly can, even though the information that he has is all negative."

During Officer Youse's second contact with Wendler there was a discussion about the rental documents and Wendler's employment, but as the district court observed, the additional information "didn't relate back to the reason for the initial stop." In fact, the rental papers "were all in order," with Wendler listed as "an authorized operator," although "somebody else" had rented the RV for Wendler.

Upon his return to the patrol vehicle, Officer Youse learned from the dispatcher that Wendler had criminal convictions or criminal activity in Florida and Colorado. This information was received about 18 minutes after the stop. Officer Youse then waited for another officer, who arrived in about 4 or 5 minutes. During this time it appears, as the district court concluded, that Officer Youse "was not pursuing any information. He was not actually working on trying to verify anything or clear up anything." Moreover, upon the assisting officer's arrival, it is apparent the officers were intent on searching the RV for drugs. Towards this end, a drug sniffing dog was requested about 21 minutes into the traffic stop.

The State asserts "[n]othing in the record remotely suggests that [Officer] Youse was dilatory in his initial investigation." But, as detailed earlier, there were several periods of time when Officer Youse was not diligently pursuing his work but appeared to be purposely extending Wendler's detention. Importantly, the State elicited no substantive testimony from Officer Youse to justify any of these particular delays.

On appeal, the State suggests a rationale for the delays, focusing on the 18 minutes which elapsed before Officer Youse received information from the dispatcher regarding Wendler's out-of-state criminal history. Yet, it is unknown when Officer Youse made the request for Wendler's out-of-state criminal history. And the State did not question Officer Youse about the criminal history check or

establish its importance for an ordinary traffic violation case. Moreover, during his testimony, Officer Youse did not mention, let alone discuss the significance of, Wendler's criminal history, even when asked to summarize the reasons "that you needed to search the RV?"

On the other hand, Wendler's counsel had a revealing exchange with Officer Youse during his cross-examination, "[Question:] . . . [At] the time you got the wants and warrants check back . . . and his driver's license came clear, you had no further reason to detain [Wendler] on the traffic violation? [Answer:] That's correct."

Officer Youse's candid testimony on this point is important. It establishes that, from the officer's viewpoint, the purpose of the traffic stop—to stop, investigate, and prepare a warning citation to Wendler for violating K.S.A. 8-1523—was fulfilled about 9 minutes after the traffic stop. With regard to this particular traffic stop then, any appreciable time in excess of 9 minutes may be considered an improper, measurable extension of the detention. See *Thompson*, 284 Kan. at 774. Of course, this presumes the officer did not obtain reasonable suspicion of unrelated illegal activity in the meantime or the driver did not voluntarily consent to continuation of the encounter. See *Thompson*, 284 Kan. 763, Syl. ¶ 5. These issues are discussed later in the opinion.

We are persuaded that, under the totality of these circumstances, detaining Wendler significantly longer than the approximately 9 minutes necessary to fulfill the purpose of the traffic stop—to investigate Wendler's violation of K.S.A. 8-1523—was an impermissible violation of the Fourth Amendment to the United States Constitution. See *United States v. Chaney*, 584 F.3d 20, 26 (1st Cir. 2009) (a minute or two did not measurably extend a stop); *Morlock*, 289 Kan. at 999 (stop was not measurably extended by a handful of questions when "the entire stop took only 12 minutes").

The State admonishes us: "This court should resist imposing a bright-line time limitation that arbitrarily marks a stop of approximately 26 minutes outside the outer bounds of a permissible *Terry* stop. See *Terry v. Ohio*, 392 U.S. 1, 18, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The State's advice is well taken, and our holding should not be misconstrued as establishing any one-size-fits-all,

bright-line time limitation. Rather, our holding is based on the district court's detailed factual findings in this unique case, the explicit testimony of Officer Youse regarding the length of time it took him to fulfill the initial purpose of the traffic stop, and the total time which elapsed until Officer Youse returned Wendler's driver's license, documents, and gave him the warning citation.

## DID OFFICER YOUSE DEVELOP REASONABLE SUSPICION OF UNRELATED CRIMINAL ACTIVITY DURING HIS INVESTIGATION OF THE TRAFFIC VIOLATION?

The next question presented is whether the measurable extension of the traffic stop beyond the 9 minutes it took to fulfill the purpose of the traffic stop—to investigate the violation of K.S.A. 8-1523—was justified by Officer Youse developing a reasonable suspicion of criminal activity unrelated to the traffic violation.

In this regard, the State relies on the following syllabus from *Morlock*:

"An officer is not required to disregard information which may lead him or her to suspect independent criminal activity during a traffic stop. When the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden the inquiry and satisfy those suspicions, graduating his or her responses to the demands of the situation." 289 Kan. 980, Syl. ¶ 5.

This syllabus refers to "suspicions," not "reasonable suspicion." It was based on text in *Morlock* where our Supreme Court cited two cases from the United States Court of Appeals for the Eighth Circuit, *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993), *disapproved by United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007), and *United States v. Pereira-Munoz*, 59 F.3d 788, 791 (8th Cir. 1995). 289 Kan. at 996. An examination of these cases clarifies the syllabus.

The "broaden the inquiry" language in *Morlock* came from *Barahona*. See 289 Kan. at 996. The Eighth Circuit eventually disapproved *Barahona* because it "appear[ed] to say that merely asking an off-topic question during an otherwise lawful traffic stop violates the Fourth Amendment." *Olivera-Mendez*, 484 F.3d at 510 (citing *Muehler v. Mena*, 544 U.S. 93, 125 S. Ct. 1465, 161 L. Ed. 2d 299

[2005]). An officer may, therefore, broaden the inquiry by asking off-topic questions during an otherwise lawful traffic stop. See *Smith*, 286 Kan. at 411-14 (discussing *Mena* and several Tenth Circuit Court of Appeals decisions).

The *length* of the traffic stop comes into play with the second case cited in *Morlock*, *Pereira-Munoz*, for which our Supreme Court provided the following parenthetical summary: "When officers develop reasonable, articulable suspicion of criminal activity during a traffic stop, they have ' " 'justification for a greater intrusion unrelated to the traffic offense' " ' and are 'permitted "to graduate their responses to the demands of their particular situation." ' " 289 Kan. at 996. *Pereira-Munoz* took the "graduate their responses" phrase from *United States v. Place*, 462 U.S. 696, 709 n.10, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983), where the United States Supreme Court rejected "a rigid time limitation" for *Terry* stops: "Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation." See *Pereira-Munoz*, 59 F.3d at 791.

Thus, under *Morlock*, officers may broaden the inquiry during a traffic stop to investigate their suspicions provided the traffic stop is not measurably extended. If that investigation produces reasonable suspicion of unrelated criminal activity, the traffic stop may be measurably extended commensurate with the particular circumstances. As the Eighth Circuit has recently stated:

" 'A constitutionally permissible traffic stop can become unlawful . . . "if it is prolonged beyond the time reasonably required to complete" its purpose.' [Citations omitted.]

" 'To continue to detain a vehicle's occupants after the initial stop is completed, the officer must have been aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.' [Citation omitted.]" *United States v. Bracamontes*, 614 F.3d 813, 816 (8th Cir. 2010).

Turning now to the substance of the argument, the State maintains "there was enough to raise a reasonable suspicion while [Officer] Youse assessed the circumstances after stopping Wendler." "Whether reasonable suspicion exists is a question of law and is

reviewed de novo." *State v. Coleman*, 292 Kan. 813, Syl. ¶ 4, 257 P.3d 320 (2011).

Our Supreme Court has provided considerable guidance with regard to the analysis of reasonable suspicion:

"Reasonable suspicion is a less demanding standard than probable cause and requires a showing of considerably less than a preponderance of the evidence, but the Fourth Amendment to the United States Constitution requires at least a minimal level of objective justification. The officer must be able to articulate more than an 'inchoate and unparticularized suspicion' or 'hunch' of possible criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000); [citation omitted].

"The reviewing court does not 'pigeonhole' each factor as to innocent or suspicious appearances, but instead determines whether the totality of the circumstances justifies the detention. *State v. DeMarco*, 263 Kan. 727, 734-35, 952 P.2d 1276 (1998). The relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but whether a sufficient degree of suspicion attaches to particular types of noncriminal acts. *United States v. Sokolow*, 490 U.S. 1, 10, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). The totality of the circumstances standard precludes a 'divide-and-conquer analysis' under which factors that are 'readily susceptible to an innocent explanation [are] entitled to "no weight." ' *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). In considering the totality of the circumstances, a reviewing court should employ common sense and the ordinary human experience and should accord reasonable deference to a law enforcement officer's ability to distinguish between innocent and suspicious actions. *United States v. Wood*, 106 F. 3d 942, 946 (10th Cir. 1997); [citation omitted]." *Coleman*, 292 Kan. at 817-18.

The State does not identify the critical point at which the investigation into the traffic violation ended and any measurable extension of the detention began based on Officer Youse developing a reasonable suspicion of criminal activity. On the other hand, Wendler persuasively argues: "The reasonable suspicion in this case must be analyzed at the point where the stop should have terminated—9:00 [minutes] on the video."

As discussed earlier, Officer Youse testified that some 9 minutes into the traffic stop there was no reason to further detain Wendler to enforce the traffic violation. In essence, the purpose of the traffic stop was fulfilled about 9 minutes after it began. Under the law, Officer Youse must have obtained or developed a reasonable suspicion of criminal activity unrelated to the traffic violation at about

that point in time in order to measurably extend the traffic stop. As a result, we will consider only those facts known to Officer Youse at about the 9-minute mark to determine if, at that time, he had reasonable suspicion to believe that Wendler was engaged in unrelated criminal activity. See *Joshua v. DeWitt*, 341 F.3d 430, 446 (6th Cir. 2003) (discounting criminal history information obtained after law enforcement officer had "already been detaining Petitioner without reasonable suspicion for quite some time").

The district court found that about 9 minutes into the traffic stop, Officer Youse knew (1) Wendler's trip originated in California and would terminate in Florida, (2) the RV was a rental, and (3) there was a very strong odor of air freshener coming from the passenger compartment of the vehicle. These factual findings, which were supported by the officer's testimony and the DVD, will be considered separately.

With regard to Wendler's route of travel, Officer Youse testified he was suspicious "they would be this far [north] if they were headed for Florida. It would be easier to take Interstate 40 across the lower states." Both parties cite *State v. DeMarco*, 263 Kan. 727, 952 P.2d 1276 (1998) which involved a trip from Los Angeles to Florida, but in that case the defendant told the officer "they had stopped in Salt Lake City to visit relatives." 263 Kan. at 729. Wendler apparently did not mention why he was on I-70, and Officer Youse testified he did not ask Wendler about his reasons for traveling this particular route.

Of course, "implausible or contradictory travel plans can contribute to a reasonable suspicion of illegal activity." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1162 (10th Cir. 2001). But Kansas is centrally located, and the United States Court of Appeals for the Tenth Circuit "has been reluctant to deem travel plans implausible—and hence a factor supporting reasonable suspicion—where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make." *United States v. Simpson*, 609 F.3d 1140, 1149 (10th Cir. 2010). Significantly, Officer Youse did not explain the basis for his suspicion regarding Wendler's travel on I-70 apart from the fact it was not the most direct route between the two states. On this limited

record, the simple fact that Wendler could have travelled a more southerly interstate highway did not make his travel plans implausible and, therefore, suspicious.

With regard to Wendler's use of a rental vehicle, Officer Youse did not explain why the use of a rental vehicle was suspicious. In *Morlock*, our Supreme Court cited *United States v. Contreras*, 506 F.3d 1031, 1036 (10th Cir. 2007), for the proposition that "[t]he mere use of rental vehicles, one-way or otherwise, has been considered as contributing to reasonable suspicion because they are 'often used by narcotics traffickers.' " 289 Kan. at 995. But in *Morlock*, an officer *testified* "based upon his training and education" that drug couriers fly to a destination and rent a vehicle to carry the drugs. 289 Kan. at 995. The portion of *Contreras* quoted by our Supreme Court in *Morlock* also was based on the explicit testimony of an officer: "[The defendant] was driving a rental car— which [the officer] knew to be 'often used by narcotics traffickers . . . [because] it can't be seized.' " 506 F.3d at 1036.

In the present case, however, the State did not provide any testimony regarding how the use of a rental vehicle under these circumstances was necessarily indicative of criminal activity—drug-related or otherwise. The State bore the burden of proof. See *Morlock*, 289 Kan. 980, Syl. ¶ 1. We will consider only those facts developed in the district court. "[B]ecause whether reasonable suspicion exists depends on the totality of the circumstances, a case-by-case evaluation is required." *State v. Moore*, 283 Kan. 344, 359, 154 P.3d 1 (2007).

For example, in *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997), another case cited by our Supreme Court in *Morlock*, 289 Kan. at 994, the Tenth Circuit held it was not suspicious for an unemployed painter to fly one way to California, rent a car, and drive back to Kansas. Of note, *Wood* does not mention any testimony from a law enforcement officer explaining why such travel would be suspicious. This kind of testimony is critical for a court in order to evaluate an officer's observations "in terms as understood by those versed in the field of law enforcement." *State v. Thomas*, 291 Kan. 676, Syl. ¶ 10, 246 P.3d 678 (2011).

Finally, with regard to the odor of air freshener, the State elicited testimony from Officer Youse based on his "training and experience" why the "very, very strong" odor of air freshener was suspicious. The officer explained "it's just common for people smuggling drugs to use air fresheners and different things to try to cover the odor of the drugs." In this particular circumstance, the State provided a solid nexus between the officer's observations and his suspicion of illegal drug activity based upon his knowledge, training, and experience.

Our Supreme Court has acknowledged this particular nexus before, observing "a 'masking agent,' despite having legitimate retail purposes, may also be used to conceal drugs and certainly may be considered in the reasonable suspicion calculus." *Moore*, 283 Kan. at 358. Yet, the Supreme Court also cautioned the "weight assigned to the odor . . . varies with the circumstances." 283 Kan. at 358. On appeal, Wendler speculates that "it is highly likely that a family traveling in an RV with an infant who is not toilet trained would use, in fact need, air freshener." We conclude that absent other suspicious facts, the strong scent of air freshener in the RV was of limited weight and insufficient by itself to establish reasonable suspicion of drug-related activity. See *United States v. Villa-Chaparro*, 115 F.3d 797, 802 (10th Cir. 1997).

For its part, the State identifies other facts in support of its contention that Officer Youse had reasonable suspicion of Wendler's criminal activity. For example, during or after the officer's second conversation with Wendler (about 15 minutes into the traffic stop), he learned the RV was a third-party rental. It appears, therefore, that Officer Youse learned of this fact only after the purpose of the traffic stop had been fulfilled. Moreover, once again, the State did not elicit testimony from Officer Youse explaining why third-party rentals are suspicious. Thus, in the present case as in *DeMarco*, there was "no explanation in the record why existence of an absentee renter would suggest involvement in criminal activity." See 263 Kan. at 741.

Other suspicious factors noted by the State were also developed appreciably after the purpose of the traffic stop was fulfilled. Wendler's criminal history was reported some 18 minutes into the traffic

stop. The State mentions the "expensive one-way rental," but this was presumably shown on the rental agreement obtained at the 15-minute mark and Officer Youse mentioned it about 20 minutes into the detention. Similarly, a conversation about "Wendler's apparent lack of financial resources to repay" the rental (which is audible after Wendler entered the RV during Officer Youse's search) occurred some 39 minutes after the start of the traffic stop.

Given the totality of the circumstances known to Officer Youse about 9 minutes into the traffic stop—the route of travel, the use of a rental vehicle, and the strong odor of air freshener inside the RV—there was insufficient reasonable suspicion to materially extend the traffic stop to investigate drug-related criminal activity.

Kansas Supreme Court precedent provides support for our legal conclusion. *DeMarco*, for example, featured not only a rental vehicle and travel from Los Angeles to Florida, but also inconsistent stories regarding travel plans, a nervous driver, evidence that I-70 "is a major drug courier highway," and "criminal record of some type on one or both of the defendants." 263 Kan. at 730. Our Supreme Court affirmed suppression in a "close" case based on deference to the district court, which "heard the witnesses and observed their demeanor." 263 Kan. at 741. In the present case, the evidence was weaker than *DeMarco*, and the district court came to a similar conclusion after considering Officer Youse's testimony.

*Moore* featured the odor of a masking agent, a fact not present in *DeMarco*, along with a vehicle registered to a third party and a driver who exhibited "severe nervousness" while carrying "little clothing" on a purported return trip to Maryland from Las Vegas for an army airborne reunion. 283 Kan. at 355. The district court denied suppression, specifically crediting the officer's expertise in drug interdiction. Our Supreme Court affirmed in another "close" case, partially in "appropriate deference to the opinions of a particular law enforcement officer on the scene . . . ." 283 Kan. at 360. Once again, the evidence was weaker here, and the district court did not specifically credit Officer Youse's expertise in drug interdiction.

We are persuaded that Officer Youse only had an inchoate and unparticularized suspicion or hunch of drug-related criminal activity at the time the purpose of the traffic stop was fulfilled. At that time, however, the officer did not have reasonable suspicion to further detain Wendler to investigate drug-related criminal activity. Wendler's continued detention was, therefore, illegal.

The district court's factual findings provided substantial competent evidence to support its legal conclusion that, at the time the purpose of the traffic stop was fulfilled, Officer Youse did not possess reasonable suspicion to materially extend Wendler's detention to investigate drug-related criminal activity.

### DID WENDLER'S CONSENTS TO ADDITIONAL QUESTIONING AND THE SEARCH OF THE RV PURGE THE TAINT OF THE ILLEGAL DETENTION?

The State contends that if this court concludes there was an illegal detention, Wendler still consented to the search of the RV. The State also asserts "the voluntariness of Wendler's consent to search the RV and the factors establishing the reasonable suspicion to search the RV purged the taint of the illegal stop." As a result, we next consider whether Wendler's presumed consents to additional questioning and the search of the RV purged the taint of his illegal detention.

"An unconstitutional seizure may infect or taint the consent to search as well as any fruits of the encounter if the nature of the seizure renders the consent to search involuntary. [Citations omitted.] Conversely, a voluntary consent to search can purge the primary taint of an illegal seizure where the connection between the lawless conduct of law enforcement officers and the discovery of the challenged evidence has become so attenuated as to dissipate the taint. [Citations omitted.]" Smith, 286 Kan. at 419.

The State bears the burden to prove "there was a break in the causal connection between the illegality and the evidence obtained as a result of it." State v. Parker, 282 Kan. 584, 596, 147 P.3d 115 (2006).

The existence of a causal break is a question of fact. See Smith, 286 Kan. at 420. Where the district court does not conduct the "taint analysis," this court may do so "given a sufficient record on

appeal." *State v. Martin*, 285 Kan. 994, 1003, 179 P.3d 457, *cert. denied* 555 U.S. 880 (2008). Although the district court did not conduct a taint analysis, the record on appeal is sufficient because the DVD memorialized the relevant events.

"Factors to be considered in determining whether consent purged the taint of an illegal detention are the proximity in time of the Fourth Amendment violation and the consent, intervening circumstances, and particularly the purpose and flagrancy of the officer's misconduct." *State v. Hayes*, 35 Kan. App. 2d 616, Syl. ¶ 11, 133 P.3d 146 (2006). "No single factor is necessarily dispositive." *Martin*, 285 Kan. 994, Syl. ¶ 4.

There were two putative consents. The first was Wendler's consent to further questioning, and the second was his consent to allow the officers to search the RV. See *State v. Diaz-Ruiz*, 42 Kan. App. 2d 325, 341-42, 211 P.3d 836 (2009) (Malone, J., concurring).

Wendler's consent to further questioning clearly was given in immediate temporal proximity to the illegal detention. Wendler's detention continued as Officer Youse asked him to exit the RV and placed him between that vehicle and the patrol vehicles. Officer Youse began asking Wendler numerous questions, such as if he had rented the RV, who paid for it, the name of the party who paid for it, how he knew that party, and whether his girlfriend was his wife or fiancée. While asking these questions Officer Youse slowly returned Wendler's driver's license and other papers. Only at the very end of this colloquy did Officer Youse advise Wendler that he was receiving a warning citation, explain it briefly, say, "Thanks a lot," and shake Wendler's hand. Wendler then turned towards the RV and took a few steps.

At the same time, Officer Youse pivoted back towards his patrol vehicle, but the DVD shows this was not visible to Wendler, who was walking the other way. Officer Youse then called out, "Hey Trever." Wendler stopped and started walking back towards the officers. Officer Youse asked, "Can I talk to you for a minute more?" Wendler said, "Yeah," and Officer Youse stepped towards him as he continued the questioning.

Only 2 seconds elapsed between Officer Youse's parting comment, "Thanks a lot," and his call, "Hey Trever." This momentary

pause in Officer Youse's battery of questions "heavily favors" a finding that there was no attenuation of the illegal detention. See *Diaz-Ruiz,* 42 Kan. App. 2d at 339.

We also do not perceive any intervening circumstances. "Examples of circumstances sufficient to create a discontinuity between the illegal stop and search include the presence of counsel, appearance before a magistrate, the issuance of *Miranda* warnings, telling the driver he is free to leave, and advising him of his right to refuse consent. [Citation omitted.]" *United States v. Ramstad,* 120 F. Supp. 2d 973, 980 (D. Kan. 2000). None of these intervening circumstances was present in this case. Officer Youse's comment, "Thanks a lot," was not as informative or definitive as advising Wendler he was free to leave or that he had a right to refuse consent to answer further questions or to permit the search of the RV. See *State v. Thompson,* 284 Kan. 763, 809, 166 P.3d 1015 (2007) (telling driver to have a nice day "was no unequivocal signal that he was free to go").

With regard to the third factor in the determination of whether Wendler's consent purged the taint of an illegal detention, we could "certainly imagine worse abuses of police authority." See *State v. Grace,* 28 Kan. App. 2d 452, 460, 17 P.3d 951, *rev. denied* 271 Kan. 1039 (2001). Yet, Officer Youse detained Wendler considerably longer than necessary for a simple traffic stop, as the officer forthrightly admitted below. The additional time spent detaining Wendler was clearly in preparation to obtain his consent in order to ask more direct, accusatory questions and search the RV for drugs. When the district court's finding of stalling tactics is added, we are persuaded Officer Youse exploited "the unlawful conduct to get to the contraband." See *Martin,* 285 Kan. at 1004.

After obtaining consent to further questioning, Officer Youse began a "shotgun of questions," as the district court described it. The officer asked Wendler if he had anything illegal in the RV, if he had been driving, if anyone else had been driving, and if he had anything illegal such as guns, marijuana, cocaine, or methamphetamine. Wendler denied possessing any illegal items.

Officer Youse then immediately asked to search the RV. As the district court found and the DVD confirms, Wendler answered

"hesitantly and reluctantly." When Wendler indicated an unwillingness to wait, Officer Youse told him it would only take "a few minutes." After Wendler agreed, Officer Youse twice directed him to step back towards the patrol vehicles.

Notably, these events occurred only seconds after Wendler had agreed to answer further questions. The tone of Officer Youse's questioning was more authoritative than it had been before. There were also no intervening circumstances, such as the officer advising Wendler of his constitutional right to refuse consent to the vehicle search.

Similar to Wendler's consent to additional questioning, his putative consent to search was temporally proximate to the prior illegal detention, there were no intervening circumstances, and, as discussed earlier, the search of the RV was an exploitation of the illegality. Because the State has not shown a causal break between Wendler's illegal detention and his consent to additional questioning and to a search of the RV, the taint of the illegal detention was not purged. Accordingly, the district court did not err in granting the motion to suppress. See *Smith*, 286 Kan. at 420; *Parker*, 282 Kan. at 596.

The State also argues that Officer Youse did not exceed the scope of Wendler's consent to search. This issue is moot, however, because the consent was tainted by the prior illegal detention. We decline to consider it. See *Smith v. Martens*, 279 Kan. 242, 244, 106 P.3d 28 (2005).

Finally, the State briefly suggests that Officer Youse had probable cause to search the RV. The State does not cite any arguments below regarding probable cause, our review of the record did not locate any, and the district court made no findings of fact or conclusions of law regarding probable cause. As a result, we decline to consider the issue of probable cause for the first time on appeal. See *State v. Warledo*, 286 Kan. 927, 938, 190 P.3d 937 (2008).

Affirmed.