NOT DESIGNATED FOR PUBLICATION

No. 116,022

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

RICHARD EDWARD EVANS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS M. SUTHERLAND, judge. Opinion filed February 10, 2017. Affirmed.

*James Crux*, *legal intern*, *Jacob Gontesky*, assistant district attorney, *William F. Hurst IV*, *assistant district attorney*, *Steven J. Obermeier*, senior deputy district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Adam Chingren*, of Johnson County Public Defender Office, for appellee.

Before ARNOLD-BURGER, C.J., PIERRON and MALONE, JJ.

ARNOLD-BURGER, C.J.:  Richard Evans was subject to an investigatory detention to search for drugs. Officers found marijuana in Evans' vehicle, and he was charged with possession with the intent to distribute, possession of drug paraphernalia, and possession of a firearm by a convicted felon. Evans filed two motions to suppress arguing that the police lacked reasonable suspicion to stop him. The first motion was denied, but the second was granted. The State now appeals asserting two claims of error.

1

First, the State claims that the district court erred in reconsidering another judge's denial of Evans' motion to suppress. Because we find that such reconsideration is wholly within the district court's discretion and we find no abuse of discretion under the circumstances here, the State's first claim fails. Second, the State claims that the district court erred in granting Evans' motion to suppress because the police had a reasonable and articulable suspicion of Evans' narcotics activity to justify their investigation. We disagree and based on the undisputed facts find that the State presents insufficient evidence to support finding that police had reasonable and articulable suspicion to stop Evans. Accordingly, the decision of the district court is affirmed.

FACTUAL AND PROCEDURAL HISTORY

The Lenexa Police Department received an anonymous tip that activity consistent with drug sales was taking place at a home on Theden Circle, an upscale neighborhood in Lenexa. In an initial attempt to investigate the tip, two detectives, Marcus Womer and Kurt Weigel, went to the home in an unmarked police car to conduct surveillance. When they arrived at the home, they saw a van with Missouri license plates backed into the driveway and two men standing nearby. At some point, the detectives identified the van as belonging to Richard Evans. Womer recognized Evans' name from a 2013 traffic stop in which he had found marijuana and a firearm in Evans' vehicle. Dispatch also alerted the detectives to the fact that Evans' had a prior arrest involving drug and weapon possession, the same one Womer remembered. Evans was apparently on pretrial bond supervision for that arrest and the case was still pending. In the 20 minutes that they remained outside the home, the officers did not see any of the activity reported in the anonymous tip. Womer testified that they observed nothing suspicious and nothing in the tip specifically referred to Evans.

At the end of 20 minutes, one of the men got into the van and drove away. The detectives followed the van.

2

While the detectives were following Evans' van, they observed that twice it failed to signal a turn. Because they were in an unmarked vehicle, the detectives asked for another officer, Corporal Ryan Sumner, to assist them with stopping Evans. Sumner only observed an inoperable license plate lamp. He wasn't told what violations the detectives had witnessed. Although the detectives and Sumner all testified to witnessing at least one traffic violation prior to stopping Evans, they admitted that the traffic violations were a pretext and they would have stopped Evans regardless.

When Sumner stopped Evans, he walked up to his vehicle and asked for his driver's license and insurance. Sumner believed that Evans appeared to be nervous, noting that his hand was shaking as he reached for his driver's license. He clarified that exhibiting nervousness when stopped by the police is not uncommon. Sumner took Evans information back to the waiting detectives, who were standing by Sumner's patrol car. He showed it to Womer. By this time there was at least one other backup officer on the scene besides Womer, Weigel, and Sumner. Summer returned and had Evans step out of the car. He had him step to the back rear passenger side of the van. Sumner testified it was highly unusual to ask a driver to step from the car on a routine traffic stop. At that point, Weigel and others approached and started asking Evans about his activity at the house on Theden Circle and where he was going. Evans responded that his brother-in-law lived in the house. Weigel asked for consent to search Evans' person, which Evans granted. No contraband was found on Evans.

While Weigel and the others were speaking to Evans, walking around his car with flashlights, and after they patted Evans down, Sumner retrieved his trained drug sniffing K-9 from his vehicle. Sumner directed the dog to sniff the outside of Evans' vehicle. The State conceded that the dog did not start around the vehicle until 14 minutes after the stop. The dog alerted on the rear bumper. Sumner returned the dog to the vehicle and then searched the undercarriage of the vehicle and found a black box that contained marijuana.

3

At no time during the stop did the officers attempt to verify the validity of Evans' license or insurance or write Evans a warning or ticket for any traffic violation.

Evans was arrested and charged with possession of marijuana with the intent to distribute, possession of drug paraphernalia, and criminal possession of a firearm by a convicted felon. Evans filed a motion to suppress the evidence discovered during the stop in August 2015, which the district court denied. After a change in counsel and presiding judge, Evans filed a second motion to suppress. Although initially skeptical of rehearing an issue that had already been decided, the district court granted Evans' second motion. The State then filed this interlocutory appeal.

ANALYSIS

*The district court did not err when it considered Evans' second motion to suppress.*

The State complains that the district court abused its discretion when it considered Evans' second motion to suppress evidence because the issues it raised had already been ruled upon in Evans' first motion to suppress. The State correctly recognizes that the decision to reconsider an earlier ruling rests within the sound discretion of the district court. *State v. Riedel*, 242 Kan. 834, 838, 752 P.2d 115 (1988). As a result, on appeal, this court reviews the district court's decision for an abuse of discretion. 242 Kan. at 838. A district court abuses its discretion when it acts (1) arbitrarily, fancifully, or unreasonably so that no person would have taken the view of the district court; (2) based on an error of law; or, (3) based on an error of fact. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

Without explicitly stating which of the three prongs of the abuse of discretion test it believes the district court's decision falls into, the State contends that "a motion to reconsider is limited to specific situations where limited circumstances warrant it" and

4

that this was not one of those situations. The State goes on to cite federal cases in which the reviewing court required a change in law, new evidence, or a showing of manifest injustice before condoning a district court's reconsideration of an issue previously addressed. In essence, the State argues that the district court committed an error of law.

The Kansas Supreme Court, however, does not require that the same federal prerequisites be met before it will affirm a district court's decision to reconsider an issue. See *Riedel*, 242 Kan. at 837-38. The policy rationale behind permitting a district court to reconsider issues previously decided during the course of litigation is to "prevent prejudice and assure the parties a fair trial." 242 Kan. at 838. Additionally, resolving issues at the district court level increases judicial economy—rather than a district judge leaving a known problem to be resolved on appeal and addressed on remand, a judge may reconsider an issue and provide a solution that alleviates the need for remedial action in the future.

In this case, the initial motion to suppress was heard by an assigned senior judge. It was clearly an issue central to the trial and it is not unreasonable for Judge Sutherland, who was going to be hearing the trial—presumably in front of a jury—to reconsider the issue prior to trial. See *Riedel*, 242 Kan. at 838 ("We think Judge Russell, as the judge actually presiding at the trial, acted properly in determining she should make the final determination as to the admissibility of evidence at the trial, even though there had been an earlier ruling on the same evidence at a pretrial motion hearing."); *State v. Johnson*, No. 101,033, 2009 WL 1911755, at *1 (Kan. App. 2009) (unpublished opinion) (affirming the district court's decision to reconsider a motion to suppress decided by a different judge than the one hearing the trial). Moreover, our Supreme Court has generally treated motions to suppress like other preliminary orders and has held that a contemporaneous objection must also be made at trial even though a pretrial ruling has been obtained. This allows the court, based on how the evidence unfolds at trial, to reconsider its ruling. See *State v. Houston*, 289 Kan. 252, 270, 213 P.3d 728 (2009). If

the judge could have reconsidered the ruling during trial, it is not unreasonable to reconsider the ruling prior to trial. Again, the purpose is at all times to seek to assure the parties a fair trial. The trial court did not abuse its discretion in reconsidering the motion to suppress.

*The district court did not err when it granted Evans' motion to suppress evidence.*

The State argues that the district court erred when it granted Evans' motion to suppress evidence that was obtained after a traffic stop was extended so that a drug dog could sniff Evans' vehicle. When reviewing a district court's denial of a motion to suppress, appellate courts utilize a bifurcated standard. Appellate courts review district courts' factual findings to determine whether they are supported by substantial competent evidence. In making this determination, appellate courts do not reweigh evidence or assess the credibility of witnesses. The ultimate legal conclusions drawn from the application of the law to the facts are reviewed de novo. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014). When the facts material to a district court's decision are not in dispute, the question of whether to suppress is one of law over which this court exercises unlimited review. *State v. Stevenson*, 299 Kan. 53, 57, 321 P.3d 754 (2014). Here, the facts are not in dispute, so this court has unlimited review of this issue.

Both the Fourth Amendment to the United States Constitution and §15 of the Kansas Constitution Bill of Rights protect citizens from unreasonable searches and seizures. Courts have interpreted this protection as requiring police to have some minimum level of reasonableness or articulable suspicion before they engage citizens in involuntary encounters, because such interactions amount to seizures. *State v. Parker*, 282 Kan. 584, 588, 147 P.3d 115 (2006). The exact level of suspicion required to initiate an encounter varies based upon the type of interaction taking place. 282 Kan. at 588.

6

Courts have distinguished between four different types of law enforcement-citizen encounters: voluntary encounters, investigatory detentions or *Terry* stops, public safety stops, and arrests. 282 Kan. at 588. Voluntary encounters and public safety stops are unique because police can engage citizens in them without first having any suspicion that the citizen has committed, is committing, or is planning on committing a crime. 282 Kan. at 588. An officer may engage a citizen in a short, investigatory detention or stop if the officer has "'prior knowledge of facts or observe[s] conduct of a person which causes the officer to reasonably suspect that such person is committing, has committed, or is about to commit a crime.'" *State v. Epperson*, 237 Kan. 707, 711, 703 P.2d 761 (1985). When an officer stops a moving vehicle, the resulting traffic stop is viewed as an investigatory detention. *State v. Thompson*, 284 Kan. 763, 773, 166 P.3d 1015 (2007). Before an arrest can be made, an officer must have probable cause to believe that a suspect has committed or is committing a crime. *Parker*, 282 Kan. at 588.

A traffic infraction provides police with the level of suspicion necessary to initiate a traffic stop. *State v. Golston*, 41 Kan. App. 2d 444, 450, 203 P.3d 10 (2009). This is true even if the traffic violation is mere pretext for the stop. 41 Kan. App. 2d at 450. Nevertheless, "Kansas law is clear that a traffic stop, like any investigative detention, must be reasonably related in scope to the circumstances which justified the interference in the first place." 41 Kan. App. 2d at 451. When an officer initiates a stop based on a traffic infraction, the scope of the stop is limited so that the officer may only "request a driver's license and vehicle registration, run a computer check, and issue a citation." 41 Kan. App. 2d at 451. Once the officer has completed those routine tasks, "the driver must be allowed to proceed on his or her way, without being subject to further delay by the officer," unless the officer has reasonable and articulable suspicion that the driver has, is, or is going to engage in some other illegal activity. 41 Kan. App. 2d at 451. In that case, the detention may be extended while the officer investigates his or her suspicions. 41 Kan. App. 2d at 451.

7

The United States Supreme Court has concluded that people do not have a legitimate expectation of privacy from searches that only reveal the possession of contraband, so the Fourth Amendment is not implicated solely by the fact that a sniff is conducted by a trained police dog. *Illinois v. Caballes*, 543 U.S. 405, 408-09, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). As a result, a trained police dog may sniff the outside of a vehicle while an officer is conducting a lawful traffic stop without reasonable suspicion that any occupant of the vehicle has illegal drugs, as long as the sniff does not extend the length of the stop. *Rodriguez v. United States*, 575 U.S. __, 135 S. Ct. 1609, 1615, 191 L. Ed. 2d 492 (2015).

Alternatively, police may conduct an investigatory stop of a vehicle based on reasonable suspicion that an occupant of the vehicle has, is, or is going to commit some crime other than a traffic infraction. *Epperson*, 237 Kan. at 711. Although reasonable suspicion is not a high bar, it does require an officer to articulate "[s]omething more than an unparticularized suspicion or hunch." *State v. DeMarco*, 263 Kan. 727, 735, 952 P.2d 1276 (1998). To determine whether reasonable suspicion existed, a court looks at the totality of the circumstances, considering both the quantity and quality of the information an officer possessed at the time he or she initiated contact to see whether the officer had "'"a particularized and objective basis" for suspecting the person stopped of criminal activity.'" 263 Kan. at 735. As with all investigatory detentions, when an officer stops a vehicle based on reasonable suspicion that the driver or a passenger has, is, or is going to commit a crime, the scope of the stop is limited by "the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19-20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1967).

Both officers testified that their stop of Evans for failing to signal a turn and a tail light violation was pretextual and that the true aim was to investigate for drugs. The district court found, based on the testimony of the officers, that none of the traditional investigation that takes place during a traffic stop (*i.e.*, verification of driver's license and

insurance with dispatch, running a records check, or issuing a warning or ticket) happened after Evans was pulled over. Accordingly, the stop could not be considered a traffic stop at all. The State seems to have accepted the district court's conclusion and makes no real attempt to argue on appeal that the dog sniff of Evans' vehicle was legal as part of a traffic stop. We agree that such an argument would be fruitless here.

In this case, officers did absolutely nothing to pursue the traffic offenses. An investigating officer must diligently pursue his or her investigation and the tasks associated with the traffic stop for the traffic stop to provide the basis for further investigatory detention. See *State v Wendler*, 47 Kan. App. 2d 182, 190, 274 P.3d 30 (2012). Here, officers had already determined there were no wants or warrants for Evans when they ran his license plate through dispatch before he even left the Shawnee address. The officers did not diligently pursue anything regarding the traffic issues once they stopped Evans. "An officer may expand the investigative detention beyond the duration necessary to fulfill the purpose of the initial stop only if there is an objectively reasonable and articulable suspicion that criminal activity was or is taking place." *State v. Jones*, 300 Kan. 630, 641, 333 P.3d 886 (2014). Although it only took about 14 or 15 minutes from the initial stop before the police K-9 identified the location of drugs under Evans car, officers do not have unlimited license to exhaust the time it would normally take to conduct a traffic stop to instead indiscriminately search the defendant or his or her property. Officers have the time that they are diligently pursuing a traffic stop to conduct an investigation to discover evidence that would lead them to further reasonable suspicion or probable cause. Because no action was taken to pursue the traffic violations, those violations cannot provide cover for the 15-minute drug investigation.

So instead, the State focuses on whether there was reasonable suspicion of drug activity to initiate an investigatory detention based on Evans' actions prior to the stop. In other words, removing the traffic violations from the equation, was there reasonable and articulable suspicion to detain and investigate Evans for drug activity?

9

The factors that the State points to in order to justify the stop of Evans are Evans' presence at a house that was suspected of being a location where drug deals were conducted and Evans' criminal history. The State also notes that Evans seemed nervous when he was stopped—this, however, is not a factor that can be considered in analyzing whether there was reasonable suspicion to stop Evans since the requisite level of suspicion must be present at the time an encounter is initiated. See *Terry*, 392 U.S. at 19-20. In order to determine whether the first two factors alone gave rise to reasonable suspicion, it is necessary to examine them more closely.

Officers testified that on the evening of March 30, 2015, they went to Theden Circle to investigate an anonymous tip that there was suspicious activity taking place at a home on the street. Specifically, the tipster reported that there was a lot of traffic coming to and going from the home—people would drive up, make contact with a resident of the home or look around in the bushes, then leave at all hours, but especially at night. Prior to March 30, it does not appear that officers had conducted any independent investigation to verify the anonymous tip.

On the evening of March 30, detectives arrived on the street in an unmarked police vehicle. As they approached the home in question, they noticed a van with Missouri tags backed into the driveway and two men standing in front of the house talking. Detectives had dispatch run the tag and identified Evans as the owner of the vehicle. One of the detectives, Womer, recognized Evans' name from a drug case that he had worked nearly 2 years prior. In that case, Womer had pulled Evans over for a traffic violation and ended up finding marijuana and a loaded firearm concealed in the door panel of Evans' vehicle. There was no indication that the case resulted in a conviction.

Detectives watched the home for approximately 20 minutes. During that time, they observed none of the suspicious activity that the tipster had reported—Evans' van was already there at the time they pulled up, they saw no one else come, stop for a short time,

and go, saw no one retrieve anything, and saw no one hand anything off to anyone else. After about 20 minutes, Evans got into his van and drove away; the detectives followed him. While following Evans, the detectives noted several traffic infractions. Eventually detectives called for someone in a marked police vehicle to stop Evans. Sumner responded to the call and made the stop.

In deciding that the information the detectives possessed prior to initiating the stop of Evans was insufficient to give rise to reasonable suspicion that Evans had, was, or was going to commit a crime, the district court relied heavily on *State v. Williams*, No. 106,239, 2012 WL 5392098 (Kan. App. 2012) (unpublished opinion). There, police conducted surveillance of a home from which

> "[d]uring the past 7 years, police had stopped at least 30 people seen leaving one of True's [the resident] homes and at least 10 of those people possessed methamphetamines or drug paraphernalia and were arrested. Three of the arrests occurred outside the South Mission home, and one of those arrestees even told police that she had bought methamphetamines from True. The police also had executed a search warrant on the home within the past year and found methamphetamines." 2012 WL 5392098, at *1.

Five minutes after they arrived, officers watched a car pull away from the home with two women in it. One of the officers identified the vehicle as belonging to Robin Buckley, an individual the police suspected "was involved in the local methamphetamine culture." 2012 WL 5392098, at *1. The officers followed the vehicle and pulled it over after they observed a traffic infraction. When officers approached the driver, they noticed that she appeared nervous and was shaking slightly. The combination of the driver's demeanor and the fact that she had been seen at a suspected drug house led the officers to call for a K-9 unit to come and search the vehicle.

While they were waiting for the K-9 to arrive, the officers conducted a standard traffic stop, checking Williams' driver's license and issuing her a citation. After the

11

officers gave Williams the citation, they began asking additional questions and requested to search the vehicle. Williams denied the request. The K-9 unit then arrived and the dog conducted a sniff of the vehicle that indicated the presence of illegal drugs. Williams was then arrested and additional drugs were found on her person.

Williams filed a motion to suppress all evidence gathered in the search. The district court denied the motion finding that there was reasonable suspicion to extend the traffic stop to conduct a sniff of the vehicle. On appeal, this court reversed. 2012 WL 5392098, at *9. This court found that Williams' connection to Buckley and to the home of someone suspected of dealing in illicit drugs combined with Williams' nervousness did not give rise to reasonable suspicion to justify extending the traffic stop to search for drugs. 2012 WL 5392098, at *4-6. Here, the district court concluded that "*Williams* is remarkably similar to this case, but, frankly, better facts, if you will, for the State, but the Court of Appeals still ruled that the fruits of the search should be suppressed."

The State argues that the result in *Williams* is at odds with other, more persuasive opinions in which this court has upheld the reasonableness of searches. The first case that the State cites is *Golston*, 41 Kan. App. 2d 444. *Golston* similarly involved a motion to suppress evidence. There, an officer was conducting surveillance of a gas station that had been the subject of several complaints from citizens concerned about drug activity over a 2-year period of time. On that day, the officer saw a man, Anderson, pull up in a rented car wearing gang colors with a known gang member in the passenger seat. The two men went inside the gas station for a few minutes then left without getting gas. The officer followed the men to an apartment complex. The passenger exited the vehicle and went to talk with a group of other individuals standing in the parking lot. After a few minutes, Anderson left alone and drove back to the gas station.

Anderson went back inside the gas station for a few minutes then returned to the car with a second man, Golston. The two drove away without purchasing gas. The officer

12

continued following the vehicle and watched as Anderson committed two traffic infractions. The officer then radioed for a uniformed officer to conduct a traffic stop. When the second officer, Pardon, stopped the vehicle, he recognized Golston as a gang member. Pardon asked for the men's licenses, verified them, and wrote a citation. When Pardon returned to the vehicle, he asked if he could search it. Anderson refused. Pardon then told them that he had called for a drug dog and the men were not free to leave until after the dog arrived and was able to sniff the car. Pardon had the men get out of the car while they waited for the K-9 unit. After the men got out, Pardon patted each down for officer safety. During the pat-down, Pardon discovered a large amount of money and drugs on Golston.

Golston filed a motion to suppress the evidence which the district court denied. The district court determined that the officers had reasonable suspicion to investigate for drug activity "based on the totality of the circumstances, including [the gas station's] reputation as a place where illegal drug activity occurs, the movement of the individuals in the vehicle to several different locations in a short period of time, and the additional information gained after the stop." 41 Kan. App. 2d at 448. This court affirmed, finding that the police had reasonable suspicion to extend the stop based on four facts:

> "(1) [Golston] had just come from an Amoco known for drug activity and where several arrests for drug-related crimes had occurred over the past 2 years, (2) he was in the SPIDER database as a documented gang member, (3) he was with Anderson who was on supervised release from prison and had been involved in a prior stop involving drugs within the last 2 weeks, and (4) Anderson had just driven Cobos form the Amoco to a suspected drug deal and it now appeared that Anderson was driving Golston from the Amoco to another possible drug deal." 41 Kan. App. 2d at 454.

The next case the State cites is *State v. Griffin*, 31 Kan. App. 2d 149, 61 P.3d 112 (2003). There, the Kansas Bureau of Investigation (KBI) set up surveillance of an apartment building where drug arrests and seizures had been made over the prior 2 years.

13

The KBI began its investigation early in the evening. Over the course of the evening, investigators watched numerous people come to the building, enter, stay for a short time, then leave. They also saw a person in a yellow shirt repeatedly exit the building, make contact with people outside, go back in, then come back out and exchange something with the person waiting. At 10:30 p.m., the KBI executed a search warrant of an apartment in the building; officers arrested several individuals in the course of executing the warrant.

While the search was being conducted, a car pulled up and parked in front of the building. As an officer approached the vehicle it started to leave until the officer stepped in front of it to stop it. This court upheld an investigatory detention of the occupants, finding that numerous facts collectively gave rise to reasonable suspicion that the car was at the apartment to engage in drug related activity. This court specifically relied on the following facts:

> "[O]nly three apartments were occupied by a total of four people; the KBI agents and Officer Life observed drug transactions at the apartment building within a few hours of the car stop; the car parked at the apartment building late at night when the other businesses on the street were closed; other drug arrests and search warrants for drugs had been made at the apartment building during the previous 2 years; convicted drug offenders resided at the apartment building; an earlier stop of a vehicle behind the apartment building had resulted in a drug arrest; and it was reasonable to infer from the facts that the occupants in the car decided to leave after seeing the other uniformed officers or Sergeant Life while the car was parked in front of the apartment building." 31 Kan. App. 2d at 154-55.

The State argues that the tip the officers received regarding the house on Theden Circle combined with the prior knowledge that they had of Evans make the facts of this case more similar to *Golston* and *Griffin* than *Williams*. However, this case differs from *Golston* and *Griffin* in at least one key way—in both of those cases, police spent time

observing the defendants or their surroundings prior to initiating stops so that they had evidence of drug activity by the defendants and/or at the locations the defendants were observed. In *Golston*, the police also had observed the person Golston was in the car with and had reason to believe that he was actively engaged in drug transactions at the time they stopped the vehicle.

Here, the officers had no independent knowledge of whether the home on Theden Circle was a drug house. The only evidence officers had that there was anything illicit taking place there was an anonymous, unsubstantiated tip. On the night of Evans' arrest, officers watched the house on Theden Circle for only 20 minutes and observed none of the suspicious activity that had been reported to them. An anonymous tip, standing alone rarely gives rise to reasonable suspicion to initiate a stop especially where, as here, the information in the tip has not been corroborated and the veracity of the tipster is unknown. See *State v. Slater*, 267 Kan. 694, Syl. ¶¶ 4-5, 986 P.2d 1038 (1999). Here, the anonymous tip did not even directly relate to Evans, but rather to a house at which he was seen. This fact raises a second red flag because it is firmly established that a person's mere proximity to a person or place suspected of being involved in illicit activity does not, without more, give rise to reasonable suspicion to conduct an investigatory stop. See *State v. Boykins*, 34 Kan. App. 2d 144, 147, 118 P.3d 1287 (2005). Based on the fact that an anonymous tip standing alone does not provide reasonable suspicion that the house or occupant of the house on Theden Circle was involved in illicit activity, Evans' connection to that place cannot provide a basis for finding reasonable suspicion existed to stop him.

That leaves only Evans' criminal history as a possible basis for finding officers had reasonable suspicion to believe he was or had been engaged in illicit activity at the time he was stopped. A person's criminal history alone cannot support a finding of reasonable suspicion. *United States v. Artez*, 389 F.3d 1106, 1114 (2004). While criminal history can be one factor that courts consider when deciding whether officers had reasonable suspicion for a stop, here, Evans' criminal history combined with his presence at the

15

house on Theden Circle is not enough to overturn the district court's suppression of the evidence. The evidence was solely that he had one prior arrest almost 2 years earlier and that he was currently on or had been on pretrial bond supervision for that offense.

There was insufficient evidence to support finding that police had reasonable and articulable suspicion to stop Evans. The district court's decision to grant the motion to suppress is affirmed.

Affirmed.