(203 P.3d 10)
No. 99,413

STATE OF KANSAS, *Appellee*, v. CORNELL GOLSTON, *Appellant*.

Opinion filed March 13, 2009.

*Jean K. Gilles Phillips*, of Paul E. Wilson Defender Project, University of Kansas School of Law, of Lawrence, for appellant.

*Matt J. Maloney*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Stephen N. Six*, attorney general, for appellee.

Before CAPLINGER, P.J., MALONE and LEBEN, JJ.

MALONE, J.: Cornell Golston appeals his conviction of one count of felony possession of marijuana. Golston claims the district court erred by denying his motion to suppress the evidence. Golston was the passenger in a vehicle initially stopped for a traffic infraction, and the police detained the driver and Golston while they waited for a drug dog to arrive. Golston argues that his rights under the Fourth Amendment to the United States Constitution were violated because the officers lacked reasonable suspicion specific to Golston to justify the length of his detention. Golston further ar-

gues that he was subjected to an illegal patdown for officer safety, which led to the discovery of marijuana in his shoe.

Some background information is necessary to understand the facts. Over a 2-year period, Wichita Police Officer Brad Elmore had received information from several citizens complaining about drug activity at the Amoco gas station located at 2001 E. 21st Street North in Wichita. Elmore had arrested several persons who either worked at that Amoco or who were frequently seen at that Amoco. One of the persons Elmore had arrested was Umana Smith. Smith was an Amoco cashier and Blood gang member whom Elmore had arrested for possession of cocaine and marijuana.

On July 30, 2003, Elmore recognized Smith's car in the Amoco parking lot and he began conducting surveillance of the station for possible drug activity. At about 10:30 p.m., Elmore noticed a vehicle pull into the station driven by a man wearing Blood gang member colors, who was later identified as Billy Anderson. Elmore recognized the passenger of the vehicle, Samuel Cobos, as a documented gang member. Elmore ran a check on the license plate of the vehicle and discovered it was a rental car, which he considered a possible indicator of drug-related activity. The two men entered the Amoco for about 5 minutes and left without purchasing gas.

Elmore followed Anderson and Cobos to an apartment complex where Cobos exited the vehicle and contacted four or five individuals who appeared to be waiting for him in the parking lot. From past experience, Elmore knew that drug dealers often completed deals in parking lots. Shortly thereafter, Anderson left the apartment complex without Cobos, and Elmore followed Anderson back to the Amoco. Anderson briefly entered the Amoco and then returned to the vehicle with another man later identified as Golston. Anderson and Golston left the Amoco, again without purchasing gas.

Elmore followed Anderson and Golston as they left the Amoco. He observed Anderson's vehicle rapidly pick up speed to approximately 50 m.p.h. in a 35-m.p.h. zone, and the vehicle also crossed the center line for approximately 200 feet. Elmore then radioed uniformed officer Eduardo Padron to stop the vehicle for the traf-

fic infractions. Elmore advised Padron of his observations that evening and his suspicion of possible drug activity.

When Padron stopped the vehicle, he recognized Golston from prior dealings and he knew Golston was a documented gang member. Padron approached Anderson and obtained his driver's license. Another officer arrived at the scene and recognized Anderson from a prior stop involving drugs within the last 2 weeks. Padron ran Anderson's and Golston's names through the Wichita Police Department's Special Police Information Data Entry Retrieval (SPIDER) system, which confirmed that both men were documented gang members and that Anderson was on supervised release from prison. Before returning to the vehicle with the citation for the traffic infractions, Padron called for a drug dog. Padron approached Anderson and asked for consent to search the vehicle, but Anderson refused. Padron informed Anderson that he had already called for a drug dog and he would have to wait.

Before the drug dog arrived, Padron asked Anderson and Golston to step out of the vehicle. Padron was concerned that Anderson or Golston, as known gang members, might have weapons to protect any drugs or money they might be carrying. Padron informed Golston that he was going to pat him down for officer safety. Golston responded, "Go ahead and check my pockets; I ain't got nothing on me." While performing the patdown, Padron noticed something in Golston's pants pocket. Padron requested permission to go into Golston's pocket, and Golston consented. Padron retrieved a large wad of money, which he immediately returned to Golston's pocket. As he continued with the patdown, Padron observed a plastic baggie sticking out of Golston's shoe. Padron asked Golston what was in his shoe, and Golston responded he had "a little weed." Padron pulled the baggie out of Golston's shoe and arrested him.

The State charged Golston with felony possession of marijuana after a prior conviction. Golston subsequently file a motion to suppress the evidence. The district court held an evidentiary hearing on the motion, combined with a bench trial. Elmore, Padron, and Golston testified. Golston testified that the stop lasted for 20 to 30 minutes before Padron asked him to exit the vehicle. Golston also

testified that Padron had stuck his finger into Golston's shoe while patting him down without Golston's permission. According to Golston, only after Padron pulled the plastic baggie out of his shoe did Golston make the statement that it contained weed.

The district court found the initial stop was justified by the traffic infractions. To the extent that Golston's testimony differed from Padron's, the district court found Padron more credible. The district court determined that the officers had reasonable suspicion to continue the stop based on the totality of the circumstances, including Amoco's reputation as a place where illegal drug activity occurs, the movement of the individuals in the vehicle to several different locations in a short period of time, and the additional information gained after the stop. The district court further found that Padron legally conducted a patdown of Golston for officer safety and that Padron discovered the baggie because it was in plain view. Accordingly, the district court denied Golston's motion to suppress the evidence. The district court found Golston guilty as charged and imposed a presumptive sentence. Golston appeals.

Golston claims the district court erred by denying his motion to suppress the evidence. Specifically, Golston argues that his Fourth Amendment rights were violated because the officers lacked reasonable suspicion specific to Golston to justify the length of his detention. Golston also claims that he was subjected to an illegal patdown for officer safety because: (1) Padron did not reasonably fear for his safety; (2) Golston's consent to the patdown was invalid; and (3) Padron's patdown exceeded the scope of a patdown for weapons.

An appellate court reviews the district court's decision on a suppression motion using a bifurcated standard. Without reweighing the evidence, the appellate court reviews the district court's findings to determine whether they are supported by substantial competent evidence. The appellate court then reviews the ultimate legal conclusion regarding the suppression of evidence using a de novo standard. *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007).

### Was Golston lawfully detained?

Golston argues that he was unlawfully detained while the police waited for a drug dog to arrive. Padron did not testify how long

the traffic stop lasted, but Golston testified the stop lasted for 20 to 30 minutes before Padron asked him to exit the vehicle. Golston does not claim that he ever requested to leave the scene of the traffic stop. However, the State does not dispute that both Anderson and Golston were being detained until a drug dog could arrive to investigate for drugs.

Before we analyze Golston's specific claims, we note that the Kansas Supreme Court has already addressed the facts of this case regarding the driver, Anderson, in *State v. Anderson*, 281 Kan. 896, 136 P.3d 406 (2006). In *Anderson*, the court concluded that Padron properly stopped the car for the traffic infractions and had reasonable suspicion to continue the stop after returning Anderson's driver's license and issuing the citation:

"The State asserts that the officers had ample information to support a reasonable suspicion that Anderson was engaged in illegal drug activity; thus they were permitted to extend Anderson's detention beyond the conclusion of the traffic stop to allow time for the drug dog sniff of the truck. We agree. As stated by the Court of Appeals:

" 'In the instant case, at the conclusion of the traffic stop, the officers had the following information: Anderson, along with documented gang member Cobos, had been at the Amoco station where there was suspected drug activity and there had been numerous arrests of individuals leaving the station; the Amoco station's cashier was a documented Bloods gang member and had been convicted the previous year for possession of drugs; after leaving the Amoco station, Anderson went momentarily to the parking lot of an apartment complex where his truck was immediately surrounded by four Hispanic men . . .; Anderson was wearing Bloods gang colors and was a documented gang member; Anderson was on parole; [one officer] had observed Anderson speeding and driving left of the center line; during a previous stop, [another officer] had learned that Anderson was carrying $4,000 on his person; and [that officer] previously received information that narcotics detectives were looking into Anderson's activities relating to narcotics trafficking.

" 'We believe that the combination of the above factors would cause an officer to be reasonably suspicious of drug activity in this case and would warrant further detaining Anderson. Importantly, an officer "does not have to *know* that the defendant committed a crime. Merely pointing to some facts that would cause a reasonable person to be suspicious is enough to conduct a *Terry* stop." *State v. Finley*, 17 Kan. App. 2d 246, 251, 838 P.2d 904, *rev. denied* 251 Kan. 940 (1992). Although the officers had not observed any unlawful conduct [other than the traffic infractions] by Anderson, they were able to point to several facts which would cause a reasonable person to suspect that possible drug activity was taking

place. Therefore, the officers were justified in detaining Anderson after the conclusion of the traffic stop.' [*State v.*] *Anderson,* 34 Kan. App.2d [375] at 386-87[, 119 P.3d 1171 (2006)]." *Anderson,* 281 Kan. at 903-04.

Golston concedes that the Kansas Supreme Court has already determined that the officers acted lawfully in stopping Anderson, the driver, and detaining him until the drug dog arrived. However, Golston attempts to distinguish *Anderson* by arguing that the Supreme Court in that case did not expressly address reasonable suspicion as to the passenger of the vehicle. Golston contends that even if the officers had reasonable suspicion to extend the duration of the stop as to Anderson, the officers lacked reasonable suspicion specific to Golston to justify the length of his detention. Golston asserts that the officers' knowledge of his gang membership was insufficient to establish reasonable suspicion of criminal activity.

We begin our analysis by examining the applicable Constitutional provisions. The Fourth Amendment to the United States Constitution guarantees that "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Section 15 of the Kansas Constitution Bill of Rights provides protection identical to that provided under the Fourth Amendment. *State v. Morris,* 276 Kan. 11, Syl. ¶ 3, 72 P.3d 570 (2003).

A traffic stop is a seizure within the meaning of the Fourth Amendment. *State v. Slater,* 267 Kan. 694, 696-97, 986 P.2d 1038 (1999). A traffic infraction provides an objectively valid reason to effectuate a traffic stop, even if the stop is pretextual. *Whren v. United States,* 517 U.S. 806, 813, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996). When a law enforcement officer makes a traffic stop, the driver and any passengers in the car are seized within the meaning of the Fourth Amendment. A passenger, therefore, has standing to challenge the constitutionality of a stop. *Brendlin v. California,* 551 U.S. 249, 255, 168 L. Ed. 2d 132, 127 S. Ct. 2400 (2007).

Once an officer lawfully detains a vehicle for a traffic violation, the officer may order the driver out of the vehicle without any

reasonable suspicion that the driver poses a safety risk. *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977). In *Maryland v. Wilson,* 519 U.S. 408, 414-15, 137 L. Ed. 2d 41, 117 S. Ct. 882 (1997), the Supreme Court applied the same rule to passengers. However, an officer may conduct a safety patdown for firearms or other dangerous weapons, sometimes called a frisk, only when the officer reasonably suspects that the person stopped is armed and dangerous. *Terry v. Ohio,* 392 U.S. 1, 30, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); see K.S.A. 22-2402.

Kansas law is clear that a traffic stop, like any investigative detention, must be reasonably related in scope to the circumstances which justified the interference in the first place. *State v. Mitchell,* 265 Kan. 238, Syl. ¶ 3, 960 P.2d 200 (1998). A law enforcement officer conducting a routine traffic stop may request a driver's licence and vehicle registration, run a computer check, and issue a citation. When the driver has produced a valid license and proof that he or she is entitled to operate the car, the driver must be allowed to proceed on his or her way, without being subject to further delay by the officer for additional questioning. 265 Kan. 238, Syl. ¶ 4. However, if an officer has a reasonable and articulable suspicion of illegal activity, such as drug possession or trafficking, the officer may detain the driver for further questioning or investigation. *State v. DeMarco,* 268 Kan. 727, 734, 952 P.2d 1276 (1998). The officer may also extend the duration of the traffic stop if the driver consents to the continuation. *State v. Thompson,* 284 Kan. 763, 774-76, 166 P.3d 1015 (2007).

In *Arizona v. Johnson,* 555 U.S. 323, 172 L. Ed. 2d 694, 129 S. Ct. 781 (2009), the United States Supreme Court addressed the detention and patdown of a passenger during a routine traffic stop under facts similar to Golston's case. In *Johnson,* three officers from Arizona's gang task force were on patrol in a neighborhood associated with the Crips gang. At approximately 9 p.m., the officers stopped a vehicle after a license plate check revealed the vehicle's registration was suspended for an insurance-related violation. The officers did not have reasonable suspicion of any other criminal activity. One of the officers ordered the driver out of the vehicle and ordered all the passengers to keep their hands visible.

A female officer noted the defendant, who was the back-seat passenger, kept his eyes on the officers, was wearing clothing she considered consistent with Crips membership, and had a police scanner in his pocket. In response to the officer's questions, the defendant provided his name and date of birth but said he had no identification with him. The defendant further indicated that he was from Eloy, Arizona, a place the officer knew was a home to the Crips gang, and that he had served time in prison.

Although not related to the scope of the stop for the registration violation, the officer decided she wanted to question the defendant further about his gang membership. She asked the defendant to step out of the car, and he complied. Based on her observations and the defendant's answers to her prior questions, the officer suspected the defendant might have a weapon. Accordingly, she frisked him for officer safety. During the frisk, she felt a gun near the defendant's waist. The defendant began to struggle, but the officer handcuffed him.

As a result of the incident, the State of Arizona charged the defendant with illegal possession of a weapon. The defendant moved to suppress the evidence as the fruit of an unlawful search. The trial court denied the motion, concluding that the stop was lawful and the officer had cause to suspect the defendant was armed and dangerous. A jury convicted the defendant of the gun-possession charge.

A divided panel of the Arizona Court of Appeals reversed the defendant's conviction. *State v. Johnson*, 217 Ariz. 58, 170 P.3d 667 (Ariz. App. 2007). The majority recognized that the defendant was lawfully seized when the officers stopped the car. However, the majority reasoned that prior to the frisk the detention had evolved into a consensual encounter. Absent reason to believe the defendant was involved in criminal activity, the court held that the officer had no right to pat the defendant down for weapons, even if the officer had reason to suspect the defendant was armed and dangerous. The Arizona Supreme Court denied review.

In a unanimous opinion, the United States Supreme Court reversed the judgment of the Arizona Court of Appeals. 555 U.S. at 334. The Supreme Court held that, in a traffic-stop setting, "it is

lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity." 555 U.S. at 327. The Court recognized that traffic stops are fraught with dangers to police officers. However, if officers routinely exercise unquestioned command of the situation, the risk of harm for officers, drivers, and passengers is reduced. 555 U.S. at 330. After reviewing its prior decisions in *Mimms, Wilson,* and *Brendlin,* the Court determined that in a routine traffic stop, the driver and all passengers are seized from the time the officers initiate the stop until the stop has concluded. The Court stated:

"A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver *and passengers* ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. [Citation omitted.] An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. [Citation omitted.] (Emphasis added.) 555 U.S. at 333.

As for the patdown, the Supreme Court determined that to justify a patdown of the driver or a passenger during a traffic stop, the officer must have reasonable suspicion that the person subjected to the frisk is armed and dangerous. The Court held that under the circumstances the officer's patdown of the defendant did not violate the Fourth Amendment's prohibition on unreasonable searches and seizures, and the Court remanded the case for further proceedings. 555 U.S. at 332-34.

*Johnson* is distinguishable from Golston's case in one important way. *Johnson* involved a routine traffic stop for a registration violation. Without engaging in any significant analysis, the Supreme Court apparently determined that an officer asking a passenger for his name, birth date, and identification, questioning him about his gang membership, ordering him out of the vehicle, and patting him down for officer safety did not "measurably extend the duration of the stop." See 555 U.S. at 333. Here, the evidence is un-

disputed that Golston's detention *was* extended beyond the con-
clusion of the traffic stop. After Padron issued the citation to
Anderson and he refused consent to search the vehicle, Padron
informed Anderson that he would have to wait for a drug dog to
arrive. Golston testified that the stop lasted for 20 to 30 minutes
before Padron asked him to exit the vehicle. Because the State
does not dispute that both Anderson and Golston were detained
beyond the duration of the traffic stop, Padron needed reasonable
suspicion to justify the length of the stop as to both suspects.

The State argues that under the totality of the circumstances,
there was reasonable suspicion specific to Golston to justify the
length of his detention. We agree. Although Golston had been in
the car for only a brief period of time before the stop, Padron still
had reason to suspect that Golston was engaged in drug activity,
based largely on the information Elmore had gathered. At the time
the duration of the car stop was extended, Padron knew the fol-
lowing information about Golston: (1) He had just come from an
Amoco known for drug activity and where several arrests for drug-
related crimes had occurred over the past 2 years, (2) he was in
the SPIDER database as a documented gang member, (3) he was
with Anderson who was on supervised release from prison and had
been involved in a prior stop involving drugs within the last 2
weeks, and (4) Anderson had just driven Cobos from the Amoco
to a suspected drug deal and it now appeared that Anderson was
driving Golston from the Amoco to another possible drug deal.

As the court stated in *Anderson,* an officer "does not have to
*know* that the defendant committed a crime. Merely pointing to
some facts that would cause a reasonable person to be suspicious
is enough to conduct a *Terry* stop." 281 Kan. at 904. Under the
totality of the circumstances, Padron could point to several facts
which would cause a reasonable person to suspect that Golston was
involved in drug activity along with Anderson. Thus, we conclude
that Golston was lawfully detained by Padron for the duration of
the stop.

### *Was the patdown lawful?*

Golston argues that he was subjected to an illegal patdown for
three reasons. First, Golston argues that Padron did not reasonably

fear for his safety. As we have stated, once a law enforcement officer has lawfully stopped a person, the officer may conduct a patdown for firearms or other dangerous weapons when the officer reasonably suspects that his or her personal safety requires it. K.S.A. 22-2402(2); *Terry*, 392 U.S. at 30. Thus, in order for Padron to pat down Golston for officer safety, Padron needed reasonable suspicion under the totality of the circumstances that Golston posed a possible threat to officer safety.

Here, at the time Padron conducted the officer-safety patdown, he knew the following facts about Golston: (1) He was in the SPIDER database as a documented gang member, (2) he was with a known gang member who was on supervised release from prison and had been involved in a prior stop involving drugs within the last 2 weeks, (3) he had just come from an Amoco known for drug activity and where several arrests for drug-related crimes had occurred over the past 2 years. Padron had several articulable reasons to be concerned that Golston, as a known gang member, might have a weapon to protect any drugs or money he might be carrying. Considering all the evidence, we have no difficulty concluding that Padron reasonably feared for his safety when he patted down Golston for weapons.

Second, Golston argues that his consent to the patdown was not voluntary. However, Golston's argument is misplaced. Consent is not a necessary prerequisite to an officer-safety patdown for weapons. As long as the officer reasonably suspects that his or her personal safety requires it, the officer may conduct a patdown without the consent of the suspect. K.S.A. 22-2402(2). An officer-safety patdown is not the same as a search of the suspect, which requires either probable cause to search or consent.

Third, Golston argues that Padron's patdown exceeded the scope of a patdown for weapons. Generally, a patdown maneuver only allows an officer to pat down a person's outer clothing without placing the officer's hands inside any pockets or under the outer surface of any garment, unless or until a weapon is found. See *Terry*, 392 U.S. at 30. Golston argues that when Padron found the baggie in Golston's shoe, he was acting beyond the limited scope of an officer-safety patdown.

Here, Padron testified that while he was conducting the patdown he observed a plastic bag sticking out of Golston's shoe. Padron asked Golston what was in his shoe, and Golston responded he had a little weed. Padron then pulled the baggie out of Golston's shoe and arrested him. Although Golston testified that Padron stuck his finger into Golston's shoe as part of the patdown without Golston's permission, the district court found Padron's testimony more credible. This court does not reweigh the evidence, and Padron's testimony provides substantial competent evidence that Padron observed the baggie in plain view while conducting the patdown. See *Woolverton*, 284 Kan. at 70.

Finally, Golston maintains that Padron's question about what was in Golston's shoe constituted a custodial interrogation in violation of *Miranda*. See *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). However, Golston admits that he failed to raise this argument before the district court. Generally, issues not raised to the district court will not be addressed for the first time on appeal. *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007). Accordingly, we will not consider Golston's argument that his rights under *Miranda* were violated.

Affirmed.