This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**KATHRYN ESQUIBEL,**

Petitioner-Appellant,

v.                                   **NO. 33,839**

**JOE ESQUIBEL,**

Respondent-Appellee,

and

**MARTIN LOPEZ III, P.C.,**

Claimant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY**
**Gerald E. Baca, District Judge**

Kathryn Esquibel
Santa Rosa, NM

Pro Se Appellant

Merrie L. Chappell Law, P.C.
Merrie L. Chappell
Albuquerque, NM

for Appellee

Jane B. Yohalem
Santa Fe, NM

for Appellee Martin Lopez III, P.C.

**MEMORANDUM OPINION**

**ZAMORA, Judge.**

**{1}** Kathryn Esquibel (Wife) appeals from the district court's enforcement of a marriage settlement agreement (MSA) entered into by Wife and Joe Esquibel (Husband). Wife also appeals the award of fees and costs to Husband's counsel and the foreclosure of a charging lien by Wife's former counsel. Finally, Wife claims that the district court judge engaged in misconduct, thereby depriving her of due process. We affirm.

**BACKGROUND**

**{2}** Wife filed a petition for dissolution of marriage on May 10, 2011. On January 23, 2012, attorneys Julie Rivers and Paul Gerber of Gerber and Bateman, PA, entered their appearance for Wife, substituting for Wife's first attorney, David Silva. Rivers sent discovery requests and received discovery responses from Husband. Subsequently, Wife disagreed with Rivers' suggested strategies and tactics, and ultimately requested that she withdraw. Rivers filed a motion to withdraw on May 9, 2012, and advised the district court that she would continue representing Wife through an upcoming hearing. Rivers also filed a charging lien, which she sought to enforce against the proceeds of the final settlement and court order.

**{3}** From June 2012 through August 2012, Wife was represented by attorney Anna Aragon. On August 23, 2012, attorney Dean Border was substituted as counsel for Wife. On January 25, 2013, a settlement mediation was conducted. The mediation resulted in a MSA between Husband and Wife on support, final distribution of property, and final distribution of debts. Husband, Wife, and counsel for both signed the MSA.

**{4}** Shortly after leaving the mediation, Wife called Border and told him that she wanted to rescind the MSA. At Wife's request, Border contacted Husband's attorney; however, Husband would not agree to rescind the agreement. Wife requested that Border immediately move to set aside the MSA and dismissed him when he did not. On February 14, 2013, Wife filed a pro se notice disavowing the mediation results of January 25, 2013. Husband filed a response as well as a motion to enforce the MSA.

**{5}** Over the next four months, Wife appeared pro se, and the parties filed various motions and responses concerning Wife's attempt to disavow the mediated MSA. On June 21, 2013, attorney Martin Lopez III entered his appearance for Wife. A scheduling conference was held on August 27, 2013. An evidentiary hearing concerning enforcement of the MSA was scheduled for January 6, 2014.

**{6}** On January 6, 2014, the district court judge urged the parties to use the four hours scheduled for the hearing to attempt to reach an agreement. The parties

3

attempted to reach a resolution; however, Wife ultimately rejected Husband's last offer. The hearing was re-scheduled for February 18, 2014.

{7} On January 24, 2014, Lopez advised Wife that his fees and costs were in arrears, specifically, Wife owed Lopez approximately $27,700. Lopez requested that Wife submit approximately $6,700 as partial payment toward her outstanding balance, or to make satisfactory arrangements on the outstanding balance. **Ex. MLIII-PC11, p. 3]**

{8} At the February 18, 2014 hearing, Lopez called an expert in clinical psychology to testify that Wife suffered from moderate Post-Traumatic Stress Disorder (PTSD). According to the expert witness, Wife felt intimidated and pressured when dealing with Husband and Wife signed the MSA because, at the time, she just wanted "it over." Afterward, Wife immediately realized the terms were not what she wanted. The expert witness testified Wife's impairment was 65 out of 100, acknowledging, however, Wife did have the capacity to form a contract.

{9} The hearing continued on March 3, 2014. Lopez called a licensed social worker to testify as to his assessment, diagnosis, and treatment of Wife. The social worker agreed Wife suffered from PTSD, and described Wife as feeling trapped and fearful in her marriage. According to the social worker, Wife was unable to make a rational decision on the day of the mediation. Wife testified about trauma in the marriage

between her and Husband. Wife described her frame of mind the day of the mediation. Wife testified that she was frightened, confused, and numb when she signed the MSA. The hearing was not concluded, and was continued to April 23, 2014.

{10}     On March 13, 2014, Lopez informed Wife that since she had not submitted any payment toward her outstanding balance or made satisfactory arrangements on the balance, he could not afford to continue representing her. Lopez advised Wife that he would represent her through the April 23, 2014 hearing. Wife responded, asking Lopez to continue representing her, but did not offer to make a payment of any amount.

{11}     At the beginning of the hearing on April 23, 2014, the district court judge expressed great concern about the expense and the emotional toll of the prolonged litigation on the parties. He told the parties he believed they were driving each other into bankruptcy. The judge directed the parties to meet for two hours, and to make an earnest effort to resolve the case. After approximately five hours, the court reconvened; the parties had reached an agreement, which was read into the record. The agreement included division of the property and debt and provided Wife would receive an equalization payment of $100,000 in lieu of alimony.

{12}     At the district court judge's request, Wife verified that she had reviewed the agreement; Wife had discussed all the issues affecting the settlement with her

attorney; Wife had not been threatened or promised anything that was not in the agreement; Wife had time to consider the agreement and she was satisfied the agreement was in her best interests; and there was no illness preventing her from fully understanding the agreement itself, or from understanding that the agreement would end litigation on all issues once and for all. Wife repeatedly affirmed that she understood and agreed. The parties signed the agreement, which was in handwritten form. The district court approved the MSA and signed it, directing that a formal MSA as well as a judgment and final decree be drafted.

{13} On April 30, 2014, Wife notified Lopez that she was displeased with the MSA. Wife indicated that she did not plan to sign the final MSA. When Husband's attorney sent Lopez a copy of the final MSA and judgment, Lopez informed Husband's attorney that he was without authority to sign the judgment and Wife would not be signing the MSA. Husband's attorney filed a motion for presentment of the MSA, judgment and motion for an award of fees and costs, and a request for sanctions in connection with the enforcement of the MSA. On May 1, 2014, Lopez filed his motion to withdraw as Wife's counsel, his notice of charging lien, and his motion to foreclose on the charging lien. The law firm, Gerber and Bateman, P.A., also filed a motion to foreclose a charging lien for Wife's unpaid legal fees and costs.

**{14}** A hearing on all pending motions was held on May 28, 2014. At the hearing, Wife explained that she felt that the discovery was incomplete, that many things had been misrepresented to her, and that the MSA was unfair. Wife stated that she signed the handwritten agreement on April 23, 2014, because Lopez made her feel pressured and because she did not fully understand the ramifications. Wife presented the district court with a proposed MSA, which she drafted herself using a pro-se litigant form.

**{15}** The district court rejected Wife's arguments and found that the MSA previously presented to the district court was appropriate and fully tracked the agreement before the court on April 23, 2014, and that the parties had entered into the MSA knowingly, voluntarily, and intelligently. The district court ordered the parties to sign the MSA, gave Wife seven days to sign the MSA and judgment, or submit specific objections. The district court further ordered Wife to sign all deeds transferring real property to Husband as provided in the MSA, within the same seven day period. Wife signed the MSA and final decree in court. Husband was awarded attorney fees and costs associated with enforcing the MSA.

**{16}** The district court then heard the motions to foreclose the charging liens of Wife's former attorneys. In order to protect information protected by attorney-client privilege between Wife and her former attorneys, the district court heard arguments on the motions to foreclose the charging liens in an ex parte, sealed proceeding. After

7

hearing the parties' arguments and reviewing detailed billing statements of Wife's former attorneys, the district court concluded that the attorneys fees and costs billed in the case were reasonable given the complexities and unique circumstances of the case.

{17} On June 6, 2014, Husband's attorney filed an affidavit advising the district court Wife had not signed the deeds transferring real property to Husband as set forth in the MSA. The district court entered an order sua sponte executing deeds, granting fees and costs, and ordering disbursement of the equalization payment owed to Wife under the MSA.

**DISCUSSION**

**Enforcement of the MSA**

{18} Wife argues that the district court erred in denying her equitable relief and enforcing the MSA. "We review a [district] court's decision to grant or deny equitable relief for abuse of discretion. Where the court's discretion is fact-based, we must look at the facts relied on by the [district] court as a basis for the exercise of its discretion, to determine if these facts are supported by substantial evidence." *Gilmore v. Gilmore*, 2010-NMCA-013, ¶ 24, 147 N.M. 625, 227 P.3d 115 (internal quotation marks and citation omitted). "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims*

8

*v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153. We view the evidence "in the light most favorable to the ruling of the district court." *Gilmore*, 2010-NMCA-013, ¶ 24.

{19}     Wife argues that she was entitled to equitable relief from the MSA due to fraud and overreaching on the part of Husband. Wife also alleges that she was coerced into signing the agreement, primarily by the district court. However, Wife does not cite to anything in the record to support her assertions of fraud and coercion. To the contrary, our review of the record reveals Wife was an active participant in the settlement negotiations. Review of the April 2014 hearing reveals that after the MSA was read into the record, the district court engaged in a colloquy with Wife to ensure Wife entered into the MSA knowingly and intelligently. The exchange went specifically as follows.

> Court: I have in front of me what purports to be a[n MSA] settling all issues in this dissolution of marriage case . . . did you sign this just a moment ago?
>
> Wife: Yes I did.
>
> Court: Did you review it to make sure it was complete and resolved all issues involved in your divorce case?
>
> Wife: Yes I did.
>
> Court: Did you discuss it with your attorney?
>
> Wife: Yes I did.

Court: Did you ask him all the questions you had about everything contained in this document and anything that might not be contained in the document but would affect this settlement?

Wife: Yes I did.

Court: Are you doing this voluntarily?

Wife: Yes.

Court: Has anybody forced you in any way to enter into this agreement?

Wife: No.

Court: Has anyone threatened you in any manner to have you enter into this agreement?

Wife: No.

Court: Has anybody promised you anything other than what's here in this agreement to get you to enter into this agreement?

Wife: No.

Court: Are you fully aware of what you are doing here today?

Wife: Yes.

Court: Are you under the influence of any drugs?

Wife: No.

. . . .

Court: Are you suffering from any illness, physical or mental, that is preventing you from understanding what we are doing her today?

Wife: No.

10

Court: And you are sure that you fully understand this document?

Wife: Yes.

Court: You understand all the consequences of entering into this agreement?

 Wife: Yes.

Court: You understand that this will end, once and for all, this litigation, you understand that?

Wife: Yes.

Court: And you want the court to approve this settlement?

Wife: Yes.

Wife agreed that she had enough time to think about the agreement and to weigh the pros and cons of the agreement. Wife also agreed that she believed that signing the agreement was in her best interest.

{20}     Then, at the May 28, 2014 hearing, Wife raised her equitable arguments claiming she lacked the necessary information to enter into the MSA; Wife did not have enough time to review the MSA; Wife had not understood the consequences of signing the MSA; and Wife had been pressured into signing it. According to Wife, after she reviewed the agreement more closely she realized that she had agreed to assume a larger amount of debt than she initially realized and that she would not have very much leftover from the equalization payment Husband agreed to pay her. Based

on this record, we cannot conclude that the district court abused its discretion in rejecting Wife's plea for equity and in enforcing the MSA. *See Harkins v. Harkins*, 1984-NMSC-057, ¶ 3, 101 N.M. 296, 681 P.2d 722 ("In New Mexico, parties in a divorce may agree and stipulate to a division of property and payment of alimony upon dissolution of marriage. In most cases a stipulation and agreement entered into without fraud or imposition and approved by the [district] court is generally enforced and should not be set aside. If equitable, a stipulated agreement should not be vacated merely because an award may have been unwise or unfortunate in light of subsequent events." (citations omitted)).

{21} Wife argues that by rejecting her proposed MSA, in favor of the MSA previously executed by Husband and Wife, the district court violated Rule 1-120 NMRA. We disagree. Rule 1-120(B)(3), requires self-represented litigants to use Forms 4A-300 through 4A-306 NMRA "to complete a dissolution of marriage by presenting proposed final orders for court approval." Under Rule 1-120(B), "all district courts must provide self-represented litigants in dissolution of marriage proceedings with the [d]omestic [r]elations [f]orms approved by the New Mexico Supreme Court" upon request. *Id.* The rule prohibits courts from distributing forms "for use in dissolution of marriage proceedings other than those approved by the New Mexico Supreme Court." *Id.* The rule also requires courts to "accept the forms

approved by the New Mexico Supreme Court in dissolution of marriage cases." Rule 1-120(D)(1).

{22} Wife claims that because she submitted her proposed MSA on Form 4A-301 (misidentified by Wife as Form 4A-305), the approved MSA form for self-represented litigants, the district court was required under Rule 1-120 to automatically approve and enforce the document. However, Form 4A-301 is approved for use as a MSA, which is an *agreement between divorcing spouses*. *See* Rule 1-120(C)(1). The substance of Wife's proposed MSA, even if submitted on Form 4A-301, did not constitute an agreement between Husband and Wife; it represented Wife's demands should the district court decide not to enforce the MSA previously executed by Husband and Wife. Rule 1-120 does not contemplate the use of Form 4A-301 for this purpose, and it does not require a court to accept or approve one of the spouse's unilateral demands simply because they are presented on a form approved by our Supreme Court.

{23} Wife claims that by enforcing the MSA executed by her and Husband, the district court essentially distributed a form "other than those approved by [our] Supreme Court[,]" contrary to Rule 1-120(B). Again, Wife appears to have misconstrued the Rule. Rule 1-120 concerns forms to be used by self-represented litigants. Wife also claims that the judgment and final decree should have "tracked"

Form 4A-305, a different pro se litigant form. Wife argues that Form 4A-305 includes a provision that allows the district court discretion to accept, reject, or modify the proposed MSA where the parties cannot reach an agreement.

**{24}** Wife's arguments are unavailing for two reasons. First, the parties had already reached an agreement, and that agreement had already been approved by the district court. At the direction of the district court, the formal draft of the MSA reflected that agreement and did not require further input by the district court. Second, the MSA executed by Husband and Wife was not created or drafted by pro se litigants. Both parties were represented by counsel during the settlement negotiations. The MSA, as well as the judgment and final decree were drafted by counsel and did not have to "track" the pro se litigant forms.

**{25}** Wife claims that the district court had a statutory duty, under NMSA 1978, Section 40-4-7 (1997), to determine fair and just spousal support. The 1993 amendments to Section 40-4-7 "substantially reworked" New Mexico spousal support law and practice. *Galassi v. Galassi*, 2009-NMCA-026, ¶ 13, 145 N.M. 630, 203 P.3d 161. In addition to substituting the term spousal support for alimony, the Legislature created four new categories of spousal support, provided guidelines for determining spousal support, and revised the statute with regard to modifications of spousal support. *Id.* ¶¶ 9, 11. "Whether to order spousal support, how much to order, and the

duration of the order are within the sound discretion of the district court." *Rabie v. Ogaki*, 1993-NMCA-096, ¶ 5, 116 N.M. 143, 860 P.2d 785.

{26}     Here, Wife claims that the MSA, which provides for an equalization payment in lieu of spousal support, is unfair. Wife also claims that spousal support was not discussed during settlement negotiations. While the MSA was being finalized, Husband's attorney advised the district court that she needed to note in the handwritten MSA the parties' agreement that the equalization would be paid to Wife in lieu of a previous award of sanctions and in lieu of spousal support. The district court addressed Wife:

> Court: [Wife], you're aware that you're giving up that claim to spousal support in this settlement?
>
> Wife: I wasn't aware of it before but...
>
> Court: I believe that your attorneys have provided, in lieu of spousal support, this equalization that they're talking about.
>
> Wife: Mmhmm.
>
> Lopez: That is correct your Honor.

After the additions were made to the MSA and read into the record, the court again verified that the parties understood and consented to the additions.

{27}     Based on the record, we conclude that the parties agreed to the equalization payment in lieu of spousal support. Wife suggests that an agreement between spouses

15

is nothing more than a proposed resolution of the issues involved in their divorce. However, our Supreme Court has held that a MSA executed by spouses during a divorce is a contract between the spouses. *See Cortez v. Cortez*, 2009-NMSC-008, ¶ 1, 145 N.M. 642, 203 P.3d 857 ("[MSA]s are contracts executed by divorcing spouses setting forth the present and future obligations of the parties."). As such, the rules of contract law apply to MSAs. *See Herrera v. Herrera*, 1999-NMCA-034, ¶ 9, 126 N.M. 705, 974 P.2d 675 (holding that MSAs are contracts subject to contract law). In the context of support as provided for in Section 40-4-7, "any binding agreements made by a divorcing couple, which include terms in excess of what the court could order on its own, are enforceable in contract." *Ottino v. Ottino*, 2001-NMCA-012, ¶ 16, 130 N.M. 168, 21 P.3d 37; *see Ruggles v. Ruggles*, 1993-NMSC-043, ¶ 60, 116 N.M. 52, 860 P.2d 182 ("[A] voluntary property settlement between divorcing spouses, dividing their community property as they see fit, is sacrosanct[.]"); *Unser v. Unser*, 1974-NMSC-063, ¶ 13, 86 N.M. 648, 526 P.2d 790 (noting "a long recognized rule" that MSAs "are highly favored in the law" (internal quotation marks and citations omitted)); *Herrera*, 1999-NMCA-034, ¶ 18 (holding that the parties bargained for unequal property division, where the complaining party could prove no fraud or similar grounds in equity to justify undoing the agreement).

16

**{28}** Accordingly, we conclude that the district court did not abuse its discretion in rejecting Wife's proposed MSA, and enforcing the MSA executed by Husband and Wife, including the provision of an equalization payment in lieu of spousal support.

**Attorney Fees and Costs**

**{29}** The district court granted Husband's motion for attorney fees and costs for enforcing the MSA, after Wife challenged the MSA, which the district court found she entered into voluntarily, intelligently, and with a full understanding of the benefits and consequences of doing so. Wife argues that the district court erred in awarding attorney fees and costs to Husband as a sanction for her attempts to challenge the MSA.

**{30}** We review the district court's award of attorney fees and costs for an abuse of discretion. *See Klinksiek v. Klinksiek*, 2005-NMCA-008, ¶ 28, 136 N.M. 693, 104 P.3d 559. A district court abuses its discretion when its ruling "exceeds the bounds of all reason" or is "arbitrary, fanciful, or unreasonable." *Meiboom v. Watson*, 2000-NMSC-004, ¶ 29, 128 N.M. 536, 994 P.2d 1154 (internal quotation marks and citation omitted).

**{31}** The district court has the authority to award attorney fees and costs in domestic relations cases. *See* Rule 1-127 NMRA; § 40-4-7(A); *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 24, 127 N.M. 654, 986 P.2d 450 (recognizing as

17

allowable attorney fees and costs in divorce and child custody proceedings). In exercising that authority the district court must consider a number of factors including "disparity of the parties' resources, . . . prior settlement offers[,] . . . the total amount of fees and costs expended by each party, . . . [and] the success on the merits." Rule 1-127.

{32} Here, the district court went to lengths to ensure Wife understood the terms of the MSA, Wife had the opportunity to confer with counsel concerning the affects of the MSA, Wife felt the MSA was in her best interest, and Wife entered into the MSA voluntarily. The district court was presented evidence concerning the amount of attorney time expended and fees and costs incurred by both Husband and Wife in this case. The district court was also aware that the assets Wife received in the MSA would allow her to pay her attorney fees and costs, the awarded fees and costs, and have funds remaining. Finally, the court rejected Wife's challenges to the MSA and found that Husband succeeded in seeking to enforce the agreement. These factors all support the award of attorney fees and costs to Husband.

{33} To the extent Wife argues that the affidavit in support of Husband's motion for fees and costs was not timely, we disagree. The district court order resolving in part, and reserving in part, Husband's expedited motion for fees and costs provided that the affidavit of fees be filed no later than June 4, 2014. The affidavit of fees was filed with

the district court on June 3, 2014. Wife claims that she was not served with the affidavit of fees, and accuses Husband's attorney of inflating her billing rates and of providing incompetent representation. We find no support in the record for these claims. We conclude that the district court did not abuse its discretion in awarding Husband attorney fees and costs under the circumstances of this case. *See Weddington v. Weddington*, 2004-NMCA-034, ¶¶ 28-29, 135 N.M. 198, 86 P.3d 623.

**Foreclosure of Charging Lien**

{34}     Wife argues that the district court erred in granting Lopez's expedited motion to foreclose his charging lien. Specifically, Wife challenges the district court's findings that: (1) Lopez's charging lien is valid and enforceable, and (2) the fees and costs included in the charging lien are reasonable. We review a trial court's findings of fact under a substantial evidence standard. *Bank of N.Y. v. Romero*, 2014-NMSC-007, ¶ 18, 320 P.3d 1. Substantial evidence is "relevant evidence that a reasonable mind could accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted). We will "resolve all disputed facts and indulge all reasonable inferences in favor of the [district] court's findings." *Id.* (internal quotation marks and citation omitted). The district court's findings will be reversed "only if the [district] court has clearly abused its discretion. An abuse of discretion occurs when a ruling is

clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims*, 1996-NMSC-078, ¶ 65.

**{35}** In New Mexico, a charging lien is an equitable remedy, which allows an attorney who has assisted a client in procuring a judgment or obtaining a fund to recover fees and costs from that judgment or fund before the proceeds are disbursed. *See Computer One, Inc. v. Grisham & Lawless, P.A.*, 2008-NMSC-038, ¶¶ 12-13, 144 N.M. 424, 188 P.3d 1175. A charging lien gives the attorney "the right to have the court interfere to prevent payment by the judgment debtor to the creditor in fraud of his right to the same," and "to prevent or set aside assignments or settlements made in fraud of his right." *Id.* ¶ 12 (internal quotation marks and citation omitted). The lien "acts as indirect payment from the client to the attorney for services rendered." *Id.* ¶ 13 (internal quotation marks omitted).

**{36}** "[T]here are four requirements for the imposition of an attorney charging lien." *Sowder v. Sowder*, 1999-NMCA-058, ¶ 10, 127 N.M. 114, 977 P.2d 1034. There must be a valid contract between the attorney and the client. *Id.* There must be a judgment or fund obtained as a result of the attorney's services. *Id.* ¶ 11. The attorney must have given notice to the appropriate parties of his intent to assert the lien. *Id.* ¶ 12. Finally, the lien must be timely asserted, meaning notice of the lien must be given "before the proceeds [from] the judgment have been distributed." *Id.* ¶ 14.

{37} Here, the first requirement is met; there was a valid contract between Lopez and Wife. Following the withdrawal of Border, Wife's fourth attorney, Wife appeared without counsel for approximately six months. Lopez agreed to take Wife's case after being contacted by one of Wife's brothers. Lopez provided Wife with a detailed engagement letter and fee agreement. In the engagement letter, Lopez advised Wife that based on her representations that there were substantial assets in the marital estate and that she had a viable spousal support claim, Lopez anticipated that the case would be complex, and would require extensive investigation and discovery. Wife agreed to the terms of the fee agreement, which required a $10,000 retainer, provided for an hourly billing rate of $250, and created a charging lien against "any funds, properties, verdicts, judgments, awards, proceeds, documents, files[,] or any other assets or interest . . ., which is recovered, preserved, maintained, released, [or] awarded as a result of [Lopez]'s efforts[.]"

{38} Concerning the second requirement, Wife contends that Lopez cannot recover his fees and costs from the funds she received in the MSA because Lopez's efforts on her behalf created "only a negative economic benefit" for her. We disagree. As Lopez indicated in the engagement letter, he anticipated proceeding with discovery and a trial on the merits of Wife's case in order to help her avoid enforcement of the initially mediated MSA. However, after Lopez presented testimony from Wife, Wife's brother

21

and two expert witnesses, the district court ordered the parties to attempt to reach a second MSA. This gave Wife the opportunity to renegotiate the terms of settlement, which she did.

{39} By the time the parties were ordered to negotiate on April 23, 2014, they had been litigating issues stemming from Wife's attempts to rescind the mediated MSA for more than one year. This prolonged litigation was costly for both Husband and Wife and depleted the total assets in the marital estate. Husband's attorney advised Lopez that Husband's assets were significantly diminished by the litigation and that he was borrowing money to pay Wife's mortgage each month. Husband was also having trouble paying his legal fees and was considering filing for bankruptcy. Lopez was concerned about the adverse effect a bankruptcy would have on Wife and on the marital estate. It appeared that both parties were feeling the effects of the prolonged and costly litigation. According to Lopez and Husband's attorney, Wife expressed her desire to reach a new MSA and actively participated in the settlement negotiations.

{40} It was Lopez's opinion that had Husband filed for bankruptcy, the majority of the marital assets would have been sold to pay debt, leaving Wife with one vehicle and possibly her residence. For this reason, Lopez and Husband's attorney worked together to prevent a bankruptcy filing and to prevent the sale of the marital assets to pay debt by helping the Husband and Wife reach a MSA. Based on these

22

circumstances, we reject Wife's contention that Lopez only created a negative economic benefit. To the contrary, it appears that the funds Wife negotiated for in the MSA were a direct result of Lopez's advocacy on her behalf.

**{41}** As to the third and fourth requirements, the record reflects, and Wife does not dispute, that notice of Lopez's intent to assert his charging lien was given to the appropriate parties and that the lien was timely asserted. Lopez filed notice of his charging lien and his motion to foreclose the lien on May 1, 2014, approximately seven weeks before the MSA funds were distributed. The notice of lien and the motion to foreclose the lien both include certificates of service indicating that copies of each document were forwarded to Wife and to Husband's attorney the same day.

**{42}** Wife argues that Lopez's charging lien is not enforceable because his total fees and costs were unreasonable. "Because a court exercises its equitable powers in enforcing an attorney's charging lien, it may inquire into the reasonableness of the asserted fee for purposes of enforcing the lien." *N. Pueblos Enters. v. Montgomery*, 1982-NMSC-057, ¶ 9, 98 N.M. 47, 644 P.2d 1036. Under Rule 16-105 NMRA, in determining the reasonableness of an attorney fees, a court may consider the following:

> (1)    the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

23

(2)     the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)     the fee customarily charged in the locality for similar legal services;

(4)     the amount involved and the results obtained;

(5)     the time limitations imposed by the client or by the circumstances;

(6)     the nature and length of the professional relationship with the client;

(7)     the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)     whether the fee is fixed or contingent.

{43}     The professional relationship between Lopez and Wife began approximately six months after the withdrawal of Border, Wife's fourth attorney. Lopez had a long standing relationship with two of Wife's brothers, one of whom asked Lopez to speak with Wife about her case. Lopez met with Wife, but was reluctant to represent her because she had dismissed four previous attorneys. However, because of his relationship with Wife's brothers, Lopez agreed to take the case.

{44}     Lopez is a sole practitioner who has practiced law for more than thirty-five years. Lopez has handled both criminal and civil cases and has extensive trial and settlement negotiation experience, including cases in the domestic relations/divorce context. Prior to attending law school, Lopez earned a masters degree in business

administration, as well as a masters degree in public administration with a concentration on budgeting and financial management. Lopez's hourly rate of $250, which Wife agreed to pay, is comparable to what Wife was charged by prior attorneys, and to the rate charged by Husband's attorney in this case. Wife concedes that the hourly rate is reasonable.

{45} Representing Wife, Lopez expended a significant amount of time getting up to speed on Wife's case and preparing for the hearing on the enforcement of the mediated MSA. Lopez reviewed the files from Wife's previous attorneys, conferred with Wife concerning witnesses and testimony, reviewed financial documents, worked to obtain evidence to support the grounds for recision Wife asserted in her pro se pleadings, drafted and filed amended pleadings, responded to Husband's motions, and prepared witnesses and exhibits for the hearing on enforcement of the mediated MSA.

{46} There were four different settings related to enforcement of the mediated MSA. Twice, the district court had the parties conduct settlement negotiations in lieu of hearing the merits of the enforcement motions and responses. After the first attempt at settlement failed, and over the course of two days, Lopez presented testimony and evidence in support of Wife's position against enforcement of the mediated MSA. Throughout Lopez's representation of Wife, she questioned the details of Lopez's

legal strategies. Lopez responded to Wife's concerns and demands while trying to minimize costs to Wife.

{47} At the May 28, 2014 motions hearing, Husband's attorney testified that Lopez made her work a great deal harder than she had ever worked in a divorce presentment hearing in her twenty-one years of practice. Lopez, she said, was "an amazing adversary." Nonetheless, Lopez explained, Wife's attempts to micromanage his handling of the case, fundamental misunderstanding of the law governing the issues in the case, and unreasonable demands complicated his representation and made it more time consuming.

{48} Lopez sent Wife numerous statements after her retainer was expended on October 2013. In January 2014 Lopez advised Wife the balance due on her account was approximately $26,000 and requested that she make a partial payment of approximately $6,700, or to contact his office to make payment arrangements. Despite Lopez's request, Wife did not make a partial payment, nor did she contact Lopez's office to make payment arrangements. By the end of the April 2014 Lopez had invested approximately 260 hours of his time and approximately 55 hours of his paralegal's time on Wife's case. Lopez had incurred more than $1,000 in costs related to the case. However, Wife still had not made any payments or payment arrangements. Lopez's bill summary reflects that at the end of April 2014 after Lopez discounted his

fees by more than $5,000, Wife's outstanding balance was approximately $60,000. Lopez explained the hardship on him as a solo practitioner and to his employees that resulted from having to carry the costs of Wife's case for an extended period of time.

{49}	After hearing Lopez's argument in support of enforcing the charging lien and reviewing Lopez's billing statements, the district court found that the fees and costs sought by Lopez were reasonable. The district court explained to Wife that her attorneys had worked hard on her behalf, and that the court did not find anything in their billing statements that was overreaching or unfair. It is noteworthy that in the engagement letter and fee agreement Wife signed, Wife agreed that she would notify Lopez within ten days of any billing statement if any fees or costs billed seemed unreasonable or unnecessary. However, Wife did not object to Lopez's billing until he withdrew and filed his charging lien. And, while Wife now claims that Lopez provided incompetent representation and committed ethical violations, these claims were also made only *after* Lopez withdrew and sought compensation for the months of work for which he was owed. We conclude that under the circumstances of this case, the district court did not abuse its discretion in enforcing Lopez's charging lien.

{50}	With regard to Wife's claims that Lopez committed ethical violations, which diminished the value of his services, Wife provides no citations to the record to support her allegations, and our review of the record reveals none. Accordingly, we

decline to address the issue. *See Chan v. Montoya*, 2011-NMCA-072, ¶ 9, 150 N.M. 44, 256 P.3d 987 ("It is not our practice to rely on assertions of counsel unaccompanied by support in the record. The mere assertions and arguments of counsel are not evidence." (internal quotation marks and citation omitted)). To the extent Wife argues that the district court erred in conducting the lien hearing ex parte, allowing only Wife and her former attorneys to be present, we are not persuaded. We note that the district court held the hearing ex parte in order to protect privileged information between Wife and her former attorneys. Because Wife provides no legal authority in support of this argument, we decline to address the issue further. *See ITT Educ. Servs., Inc. v. Taxation & Revenue Dep't*, 1998-NMCA-078, ¶ 10, 125 N.M. 244, 959 P.2d 969 (stating that this Court will not consider propositions that are unsupported by citation to authority).

**Judicial Misconduct**

{51}     Wife asserts that the misconduct of the district court judge deprived her of due process. Wife complains that the district court was biased against her and that the proceedings in this case were unfair. We decline to address these claims for two reasons. First, Wife does not point to where in the record these issues were preserved. *Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005-NMCA-022, ¶ 14, 137 N.M. 26, 106 P.3d 1273 ("[O]n appeal, the party must specifically point out where, in the record, the party invoked the [appellate] court's ruling on the issue. Absent that citation to the record or any obvious preservation, we will not consider the issue."). Second, Wife makes the assertions of misconduct without providing citations to authority or citations to the record. *See* Rule 12-213(A)-(C) NMRA (requiring the parties to properly present this Court with the issues, arguments, and proper authority); *Chan*, 2011-NMCA-072, ¶ 9 ("It is not our practice to rely on assertions . . . unaccompanied by support in the record . . . mere assertions and arguments . . . are not evidence." (internal quotation marks and citation ommitted)); *Muse v. Muse*, 2009-NMCA-003, ¶ 72, 145 N.M. 451, 200 P.3d 104 ("We will not search the record for facts, arguments, and rulings in order to support generalized arguments."); *ITT Educ. Servs., Inc.*, 1998-NMCA-078, ¶ 10 ("Issues raised in appellate briefs that are

unsupported by cited authority will not be reviewed . . . on appeal." (alterations, internal quotation marks, and citation omitted)).

**Attorney Fees on Appeal**

{52}    Lopez requests that he be awarded attorney fees on appeal, arguing Wife's claims against him on appeal are frivolous; lacking any basis in law or fact; and are put forth in bad faith. For the reasons discussed above, we agree. *See* Rule 12-403(B)(3) NMRA (providing that an appellate court may award "reasonable attorney fees for services rendered on appeal in causes where the award of attorney fees is permitted by law, if requested in the briefs or by motion filed within ten (10) days of entry of disposition"); *State ex rel. N.M. State Highway & Transp. Dep't v. Baca*, 1995-NMSC-033, ¶ 11, 120 N.M. 1, 896 P.2d 1148 (recognizing that appellate courts "have inherent power to impose a variety of sanctions on both litigants and attorneys in order to regulate their docket, promote judicial efficiency, and deter frivolous filings"). We conclude that under the circumstances of this case, Lopez is entitled to attorney fees and costs on appeal. However, the amount must be determined. "Accordingly, we remand this matter to the district court to determine reasonable attorney fees and costs for [Claimant] on appeal." *See Am. Nat'l Prop. & Cas. Co. v. Cleveland*, 2013-NMCA-013, ¶ 33, 293 P.3d 954.

30

**CONCLUSION**

{53}    For the foregoing reasons we affirm.

{54}    **IT IS SO ORDERED.**

_____
                                    **M. MONICA ZAMORA, Judge**

**WE CONCUR:**


_____
**TIMOTHY L. GARCIA, Judge**


_____
**J. MILES HANISEE, Judge**